**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Arthur G. STRISSEL, Jr.,**
**Defendant–Appellant.**

**No. 89–5534.**

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 7, 1989.

Decided Aug. 21, 1990.

Amended by Order Aug. 27, 1990
and Dec. 6, 1990.

Andrew Jay Graham (argued), Kramon & Graham, P.A., Baltimore, Md., for defendant-appellant; Kevin F. Arthur, on brief.

Jane F. Barrett, Asst. U.S. Atty. (argued), Baltimore, Md., for plaintiff-appellee; Breckinridge L. Willcox, U.S. Atty., on brief.

Before RUSSELL and WILKINS, Circuit Judges, and BUTZNER, Senior Circuit Judge.

PER CURIAM:

Arthur G. Strissel, Jr., is the former Executive Director of the Housing Authority of the City of Annapolis, Maryland. As part of Strissel's responsibilities in that position, he distributed funds provided by the U.S. Department of Housing and Urban Development ("HUD") for public housing projects. One of the federal grant programs administered by Strissel was the Modernization/Comprehensive Improvement Assistance Program ("CAIP"). This program provided federal funding for the renovation and modernization of public housing complexes. In the instant case, Strissel was convicted of taking kickbacks from contractors in return for granting those contractors fattened contracts on CAIP projects. Strissel would either receive cash kickbacks from these individuals, or "free" construction work on his home or other properties owned by him.

In a jury trial, Strissel was convicted on three counts of wire fraud (18 U.S.C. § 1343), six counts of bribery (18 U.S.C. § 201) and one count of racketeering (18 U.S.C. § 1962). Subsequent to trial, a forfeiture hearing was held, and he was made to forfeit many assets. Strissel appeals, contending that numerous errors were made in his trial below. Because we find no error, we affirm.

## I.

At trial, chart summaries were entered into evidence by the government and presented to the jury. These were used to illustrate the gross profit earned by various subcontractors on the jobs under scrutiny, and also to show one subcontractor's dramatic increase in work with HACA. Much, but not all, of the underlying documentation for these charts was submitted into evidence. Appellant alleges that it was error for these charts to be admitted as trial exhibits since *all* of the supporting documents were not in evidence.

The appellant is wrong. This issue actually has not been addressed previously in this Circuit. However, a reading of the plain language of Federal Rule of Evidence 1006 makes it clear that there is no requirement that all of the voluminous evidence supporting a chart or graph be introduced into evidence as a precondition to the introduction of that chart or graph. Rule 1006 states:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at [a] reasonable time and place. The court *may order* that they be produced in court.

(Emphasis added.) The last sentence of this rule indicates that the trial judge may order the underlying documentation to be produced in court in his discretion. Since this decision is within the judge's discretion, the rule does not require that the underlying evidence be introduced into evidence in all cases. Those two positions are mutually exclusive. *See* J. Weinstein & M. Burger, *Weinstein's Evidence*, ¶ 1006[1], p. 1006–5 (1989).

The first sentence of Rule 1006 infers the same result. The rule's language recognizes that it often takes a great deal of court time to introduce a legion of documents to establish a single point. As the Advisory Committee notes indicate, it would be a grueling waste of time to examine all of the underlying evidence in court, and hence charts and summaries are per-

mitted within the judge's discretion.[1] *See also Weinstein's Evidence*, at 1006–2–3. Weinstein cites numerous cases for this proposition. *See id.* at p. 1006–3, n. 2 (1989 supp.).

Appellant cites three cases that hold that certain trial summaries were proper *since* the underlying documents were in evidence. However, none of these cases addresses the present situation where the underlying documents were *not* in evidence. *See United States v. Porter*, 821 F.2d 968, 975 (4th Cir.), *cert. denied*, 485 U.S. 934, 108 S.Ct. 1108, 99 L.Ed.2d 269 (1987); *United States v. Dorta*, 783 F.2d 1179, 1183 (4th Cir.), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3274, 91 L.Ed.2d 564 (1986); *United States v. Keltner*, 675 F.2d 602, 605–06 (4th Cir.), *cert. denied*, 459 U.S. 832, 103 S.Ct. 71, 74 L.Ed.2d 71 (1982).

Although none of these cases controls the case at bar, certain language in the *Keltner* opinion must be addressed. There, the court stated that "The charts are admissible only if they are 'based upon and fairly represent competent evidence already before the jury'." 675 F.2d at 606, *quoting United States v. Conlin*, 551 F.2d 534, 538 (2d Cir.1977), *cert. denied*, 434 U.S. 831, 98 S.Ct. 114, 54 L.Ed.2d 91 (1977).[2] The use of the word "only" in that statement was dicta, and was, in our opinion, erroneous. In *Keltner*, the court held that chart summaries were admissible because all of the underlying documentation had been introduced into evidence, and because the charts only contained a few typographical errors that were not prejudicial. The *Keltner* court did not address the introduction of chart summaries without the introduction of the supporting evidence, and it did not even refer to Rule 1006 in its

analysis. Hence, *Keltner* does not control this case.[3]

Appellant also claims that these charts were based upon fraudulent and incorrect information, and are therefore inadmissible. This is despite appellant's opportunity to review the underlying documents and cross-examine the witnesses and the preparer of the charts. Many of the underlying documents that were introduced were never objected to by the defendant. However, adopting the position of the Fifth Circuit, which we do, we require only that the underlying evidence be admissible and available to the opponent so that a proper cross-examination may be had. *Porter*, 821 F.2d at 974–75.

## II.

The other issues raised by Strissel are not questions of first impression. Finding no error, we dispose of them without extensive discussion.

### A. *Brady Materials*

Appellant argues that "critical impeachment evidence" was withheld by the prosecution, in the form of the government's interview notes with four of its key witnesses: Charles Ruff, Carroll Dunton, Robert Kniffen, and James Blouin. These were contractors who paid kickbacks to Strissel and testified for the government at trial. The appellant claimed that these interview notes might show that these contractors changed their story to match the government's case only after government harassment and threats. However, a review of the record demonstrates that no

---

1. The Advisory Committee's note states:
   The admission of summaries of voluminous books, records, or documents offers the only practicable means of making their contents available to judge and jury. The rule recognizes this practice, with appropriate safeguards.

2. *Conlin* in turn was quoting *Gordon v. United States*, 438 F.2d 858, 876 (5th Cir.1971).

3. Indeed, the Fifth Circuit's position in *Gordon* has changed. It no longer requires that all of the evidence supporting a summary chart or

graph be admitted into evidence; instead, it only requires that the underlying evidence be admissible and available to the opponent so that a proper cross-examination may be had. *See Hackett v. Housing Authority of San Antonio*, 750 F.2d 1308, 1312 (5th Cir.), *cert. denied*, 474 U.S. 850, 106 S.Ct. 146, 88 L.Ed.2d 121 (1985); *Soden v. Freightliner Corp.*, 714 F.2d 498, 506 (5th Cir.1983). Thus, the Fifth Circuit no longer requires that the underlying documentation be admitted into evidence.

*Brady*[4] materials were withheld. For example, the appellant's most detailed claim concerns Charles Ruff. Ruff initially denied that he had paid Strissel cash kickbacks in return for inflated contracts, even though he was obliged to provide truthful information to the government pursuant to an agreement he struck with the prosecutors. A polygraph examination proved that this was untrue, and Ruff then admitted making cash payments. Thus, the government did not improperly pressure Ruff into changing his story, and the defendants were aware of how the change came about.

The appellant's claim regarding Carroll Dunton is just as frivolous. As with Ruff, the appellant claims that interview notes taken by the prosecutors would indicate that Dunton changed his story due to improper government coercion, and thus these notes constitute *Brady* materials. Yet, Dunton never testified at trial. These materials would only hypothetically have been helpful in attacking the credibility of any testimony by Dunton that he paid kickbacks to Strissel, yet Dunton never took the stand, and thus never offered testimony of kickbacks. This is ludicrous. The other claims of *Brady* materials are likewise meritless, and do not warrant discussion.

## B. *The Voir Dire Prior to the Forfeiture Hearing*

■ The appellant contends that the trial court erred in refusing to voir dire the entire jury when at least one juror indicated that he had misinterpreted the court's admonition not to read media accounts of the trial. This incident took place at the beginning of the forfeiture hearing that took place after Strissel was convicted. Again, the facts belie the appellant's contention. When the jury returned for the forfeiture hearing six days after the end of the trial, the judge asked whether any jury members had read anything about the case in the media. *One* juror indicated that he had read something. Questions posed by the judge determined that this exposure had no effect, since the juror already knew the information to which he was exposed. No other jurors indicated that they had read or heard anything in response to the judge's initial question. Thus, there was no need to voir dire the jury further.

## C. *"Public Official" and 18 U.S.C.*

■ Strissel was convicted of receiving bribes as a U.S. "public official" under 18 U.S.C. § 201. He argues that he does not fit within the definition of "public official" contained within § 201(a) of that act:

> [T]he term "public official" means Member of Congress, Delegate, or Resident Commissioner, either before or after such official has qualified, or an officer or employee *or person acting for or on behalf of the United States*, or any department, agency or branch of Government thereof, including the District of Columbia, in any official function, under or by authority of any such department, agency, or branch of Government, or a juror[.]

(Emphasis added.) The appellant argues that he was not employed only by the federal government, and that his agency's funding was not entirely federal. True, Strissel also had some state responsibilities and state funding. However, he does not argue that he was not distributing federal monies in a program established by the federal government.

The appellant's argument must fail. In *United States v. Velazquez,* 847 F.2d 140 (4th Cir.1988), this Circuit adopted a broad reading of "public official," drawing on the leading case from the Supreme Court:

> To determine whether any particular individual falls within this category, [public officials], the proper inquiry is not simply whether the person has signed a contract with the United States or agreed to serve as the Government's agent, *but rather whether the person occupies a position of public trust with official Federal responsibilities.* Persons who hold such positions are public officials within the meaning of § 201 and liable for prosecution under the Federal bribery statute.

---

4. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

*Id.* at 142 (emphasis added), *quoting Dixson v. United States*, 465 U.S. 482, 496, 104 S.Ct. 1172, 1179, 79 L.Ed.2d 458 (1984). In *Velazquez*, this Court found that a state employee (a county deputy sheriff) working in a federal prison, guarding both state and federal prisoners, and being paid entirely by the state, was a "public official" within the meaning of this section. He had aided the escape of several federal prisoners in return for a bribe. This Court noted that it did not matter that the deputy received no federal funds, and that he had no contract with the federal government. The "nature of his responsibilities" was federal, and thus he was a "public official." *Id.* Given that precedent, Strissel cannot argue that he was not a federal official. He administered federal funds in a federal program, and the nature of his responsibilities in this case was clearly federal.

## D. *The Forfeiture Order*

■ Appellant contends that he forfeited certain items that were not listed in the indictment, and hence he had no notice that these items were at issue and they should not have been taken. These additional items were materials and services that were provided to Strissel as kickbacks by several contractors. The appellant relies on Federal Rule of Criminal Procedure 7(c)(2):

> (2) Criminal Forfeiture. No judgment of forfeiture may be entered in a criminal proceeding unless the indictment or the information shall allege the extent of the interest or property subject to forfeiture.

This Circuit, however, has held that "The rule does not ... require that the indictment describe each item subject to forfeiture. This can be done in a bill of particulars." *United States v. Raimondo*, 721 F.2d 476, 477 (4th Cir.), *cert. denied*, 469 U.S. 837, 105 S.Ct. 133, 83 L.Ed.2d 74 (1984). It is sufficient that the "government's 'open file' policy provided [the defendant] with access to all information in the government's possession and with adequate notice of its intention to seek forfeiture." *United States v. Amend*, 791 F.2d 1120, 1125 (4th Cir.1986), *cert. denied*, 479 U.S. 930, 107 S.Ct. 399, 93 L.Ed.2d 353 (1986).

The rule of *Amend* defeats the appellant's argument. The government had an open file policy that provided Strissel with adequate notice of the items for which forfeiture was sought, but even common sense was sufficient to put Strissel on notice. Surveying the list of the items at issue, there is no way that Strissel did not know that forfeiture of these items would be sought. These items were not included in the indictment merely because the government did not know of these particular perks at the time of the grand jury hearing. Strissel had adequate notice under the general description in the indictment.

## E. *Pre-Trial Publicity*

■ Before trial, the appellant moved for a change in venue, contending that he could not obtain a fair trial in Baltimore due to pretrial publicity. This motion was denied, and we find that this ruling was proper. There were some newspaper reports, indeed some front page stories, regarding Strissel and the Annapolis branch of HUD. However, most reports were in relatively small papers, not the *Baltimore Sun*, the leading Baltimore newspaper (the trial was held in Baltimore). Moreover, most of the pretrial publicity did not really concern the issues at trial. Much of the early publicity concerned improprieties by area contractors in performing HUD jobs. These stories did not paint Strissel in a bad light—in fact in one he is quoted trumpeting that these contractors were suspended from doing business with his agency. Many later stories and editorial cartoons were critical of Strissel, but largely focused on a different issue. It appears that Strissel was accused of abusing his vacation time allotment while running HUD in Annapolis. While this is critical of Strissel, it did not concern issues at trial. More importantly, there is no showing that the trial judge had any difficulty in impaneling an unbiased jury because of newspaper publicity. Hence, the district judge did not commit "manifest error" in refusing to grant a change in venue. *Patton v.*

*Yount*, 467 U.S. 1025, 1032, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847 (1984).

### F. *The Reference to Al Capone*

■ In the government's opening statement, the prosecutor said: "The concept of racketeering, I think, is a notion of organized crime, or Al Capone; but it's also fair to use this statute to address what the Defendant did...." The appellant argues that he was being compared to Al Capone, and so he should get a new "fair" trial. The appellant's contention misrepresents the point that was being made. The prosecutor did not say that Strissel was like Capone. The prosecutor was explaining that the RICO statute does not apply only to gangsters. Instead, it is designed to encompass any criminal activity that constitutes racketeering activity. A defendant need not be a mobster to forfeit assets. Accordingly, this comment was not prejudicial.

The judgment of the district court is hereby

AFFIRMED.