No. 95-1360

United States of America,    *
                             *
        Plaintiff - Appellee, *
                             *   Appeal from the United
v.                           *   States District Court for the
                             *   District of Minnesota.
Tou Hang,                    *
                             *
        Defendant - Appellant.*

                    Submitted:  October 17, 1995

                       Filed:  February 7, 1996

Before WOLLMAN, FLOYD R. GIBSON, and MORRIS SHEPPARD ARNOLD,
     Circuit Judges.

FLOYD R. GIBSON, Circuit Judge.

        Following a five day trial, a jury convicted appellant Tou
Hang of three counts of accepting a bribe as a public official in
violation of 18 U.S.C. § 201(b)(2)(A) (1994).  The district court[1]
sentenced Hang to three concurrent thirty-three month terms of
imprisonment.  Hang now appeals his convictions and sentence, and
we affirm.

I.  BACKGROUND

        From approximately January of 1985 until April of 1993, Hang
worked as an eligibility technician for the Minneapolis Public

_____

        [1]The HONORABLE PAUL A. MAGNUSON, Chief United States District
Judge for the District of Minnesota.

Housing Authority ("MPHA"), an independent public corporation organized under Minnesota law and established for the purpose of administering federal programs. MPHA, like thousands of other public housing authorities across the nation, implements the Federal Low Income Housing Program, see 42 U.S.C. §§ 1404a-1440 (1988 & Supp. V 1993), by providing federally subsidized housing to eligible low income families. While MPHA necessarily complies with strict regulations imposed by the United States Department of Housing and Urban Development ("HUD"), see 24 C.F.R. §§ 900.101-999.101 (1995), it is locally operated and staffed by local employees. MPHA receives a minute amount of money from local sources, but federal funding comprises the overwhelming majority of its budget. In fact, the entire budget of MPHA, including expenditures, is subject to HUD approval.

In MPHA's written statement of policies, which was reviewed by HUD, the eligibility technician is identified as the individual who determines whether a particular housing applicant meets federally imposed threshold criteria. In addition, the manual specifies that the eligibility technician must ascertain whether an applicant qualifies for any federal or local housing preferences.[2] In carrying out these duties during the time relevant to the charges in this case, Hang screened applications to verify whether persons were initially qualified or entitled to any preferences for low income housing. After Hang confirmed an applicant's eligibility, that individual would be placed on a waiting list to receive a house. When an applicant for whom Hang had been responsible reached the top of the list, a process that normally took a significant amount of time, Hang would offer that person the next available home. Local employees supervised Hang's activities, and HUD did not have any direct role in paying Hang or conducting his

---

[2]If an applicant qualifies for a preference, he will receive more desirable placement on the waiting list for federally subsidized housing.

performance reviews.

On September 14, 1994, the United States returned an amended indictment against Hang charging him with three counts of accepting a bribe as a public official in violation of 18 U.S.C. § 201(b)(2)(A). The Government contended that Hang, a native of Laos, used his bilingual skills to prey on housing applicants who were also immigrants from Southeast Asian countries. Each count in the indictment represented one incident in which Hang allegedly accepted money from an Asian individual in order to accelerate the application process. Hang apparently communicated to these unfortunate and vulnerable victims that they would have to pay him money in order to obtain federally subsidized housing.

One day before trial, Hang's attorney made his first efforts to contact the Government's witnesses. During these attempted interviews, counsel learned that one of the persons who reportedly bribed Hang, Syphong Souvannarath, had resided at the University of Minnesota Hospital for approximately four weeks to undergo treatment for an unspecified mental illness. Also, Hang's lawyer discovered that another Government witness, Vanhsy Prasomsack, was taking some sort of medication. Based on these findings, and because of other suspicions regarding prosecution witnesses, Hang, as an indigent defendant, made an ex parte motion requesting the district court to authorize subpoenas requiring the University of Minnesota Hospital and Clinic, along with various other Government agencies, to release documents relating to the witnesses. Nonetheless, after concluding that Hang's entreaty represented a mere "fishing expedition" for evidence, the court refused to issue the desired subpoenas duces tecum. The court further declined to issue a witness subpoena for Hang Sao, Hang's Laotian uncle who had been present during the defense's eleventh hour interviews with the prosecution witnesses.

The jury subsequently convicted Hang of all counts, and the

3

district judge originally released him on bond pending sentencing. When police officials notified the court that Hang's friends and relatives were terrorizing certain individuals who had testified against the convicted felon, the district judge ordered Hang to appear at a detention hearing. Finding that Hang had failed to establish by clear and convincing evidence that he did not pose a danger to another person or the community, the judge ordered that Hang be taken into custody until sentencing.

At sentencing, pursuant to the applicable sentencing guideline, the district judge adjusted Hang's base offense level according to the value of the benefit he conferred on those who bribed him. In addition, influenced by the pattern of threats and intimidation against Government witnesses effected by Hang's intimates, the judge imposed a two point enhancement for obstruction of justice. Choosing the lowest imprisonment term possible under the relevant guideline range, the district judge sentenced Hang to three concurrent thirty-three month periods of confinement.

On appeal, Hang contests both his convictions and sentence. He argues that the district court lacked jurisdiction over this case because, as a local employee carrying out allegedly ministerial duties, he was not a "public official" under 18 U.S.C. § 201(a)(1). Further, he feels that his conviction should be overturned because the district court improperly refused to issue the requested defense subpoenas. In challenging his sentence, Hang contends that the district court improperly calculated the benefit conferred upon those who bribed him. Finally, because he claims that no direct evidence connected him to the terrorism perpetrated against Government witnesses, Hang asserts that the district court erroneously imposed the obstruction of justice enhancement. We address each of these issues seriatim.

4

## II.  DISCUSSION

### A.    Public Officials under 18 U.S.C. § 201(a)(1)

Under 18 U.S.C. § 201(b)(2)(A), the provision applicable to Hang's conduct, a public official is precluded from accepting a bribe in exchange for "being influenced in the performance of any official act."  18 U.S.C. § 201 (b)(2)(A) (1994).  As relevant to this case, the statute defines a public official as:

> an officer or employee or person acting for or on behalf
> of the United States, or any department, agency or branch
> of Government thereof . . . in any official function,
> under or by authority of any such department, agency, or
> branch of Government . . . .

Id. § 201(a)(1).  Hang claims that, as an employee of an independent local public corporation, he did not act "for or on behalf of" the United States Government.  Furthermore, he argues that he could not otherwise have been a public official because his "low-level" position did not involve any official functions.  The classification of an individual as a "public official" is a legal determination, and we thus review this issue de novo.  See United States v. Madeoy, 912 F.2d 1486, 1494 (D.C. Cir. 1990), cert. denied, 498 U.S. 1105 (1991).

The Supreme Court in Dixson v. United States, 465 U.S. 482 (1984), considered the appropriate scope of the term "public official."  In that case, after extensively detailing the historical underpinnings of 18 U.S.C. § 201, the Court explained that Congress had intended to enact a broadly applicable federal bribery statute.  Id. at 496.  The Court concluded that "§ 201(a) has been accurately characterized as a comprehensive statute applicable to all persons performing activities for or on behalf of the United States, whatever the form of delegation of authority." Id. (quotation omitted).  Accordingly, when deciding whether a

5

particular individual is subject to the statute's prohibition:

> the proper inquiry is not simply whether the person had signed a contract with the United States or agreed to serve as the Government's agent, but rather whether the person occupies a position of public trust with official federal responsibilities. Persons who hold such positions are public officials within the meaning of § 201 and liable for prosecution under the federal bribery statute.

Id. (emphasis added). In applying this newly articulated legal standard to the facts before it, the Court had "little difficulty" in concluding that the petitioners, executives of a private nonprofit corporation responsible for allocating funds made available to a municipality through a federal block grant program, were public employees for purposes of § 201.

Following the Dixson decision, our sister circuits have construed § 201 to encompass a wide range of jobs involving varying degrees of federal responsibility. See, e.g., United States v. Strissel, 920 F.2d 1162, 1165-66 (4th Cir. 1990)(applying the statute to the executive director of a local housing authority); Madeoy, 912 F.2d at 1494-95 (determining that a fee appraiser approved by the Veterans' Administration was a public official); United States v. Velazquez, 847 F.2d 140, 141-42 (4th Cir. 1988)(applying § 201 to a county deputy sheriff who was responsible for supervising federal inmates). The Fourth Circuit's decision in Velazquez is particularly instructive. There, a federal inmate challenged his conviction under § 201 for bribing a deputy sheriff employed by Mecklenburg County, North Carolina. Velazquez, 847 F.2d at 141. Pursuant to a contract with the United States Government, the Mecklenburg County Jail agreed to provide supervision for certain federal inmates. Id. at 142. Those inmates were not separated from state inmates, and it does not appear that the jailers were required to treat the federal charges differently from other prisoners. See id. Nonetheless, the court examined the "nature of the responsibilities designated to [the

6

jailer]," id., and it determined that he was a public official for purposes of § 201. Because the jail was subject to periodic inspections by federal employees, and because the jailer could not have supervised federal inmates absent some federal authority, the Fourth Circuit concluded that the county employee fell within the ambit of the bribery statute. Id.

Turning to the facts of this case, we must analyze the nature of the responsibilities given to Hang in order to ascertain whether he possessed "a position of public trust with official federal responsibilities." Dixson, 465 U.S. at 496. It is manifest that Hang occupied a position of public trust. He was on the front line in the effort to provide affordable housing to eligible families. As the person responsible for collecting, verifying, and updating information pertaining to applicants, he acted as the liaison between vulnerable and frequently desperate individuals and the organization designed to furnish them with federally subsidized homes. Especially considering the fact that Hang interacted with many Southeast Asian applicants who did not speak English, it is natural to assume that those persons looked up to him and expected him to shepherd them through the often labyrinthine quest to obtain desired government services. We have no problem, then, in concluding that Hang occupied a position of public trust.

Similarly, we find that Hang's employment involved official federal responsibilities. In contrast to the county jail in Velazquez, which clearly performed important state and local functions, the MPHA was organized for the exclusive purpose of implementing federal programs and is subject to exacting oversight by a federal agency. In addition, during the time period relevant to this case, Hang was largely responsible for determining who qualified for federally subsidized housing. According to Connie Toavs, Hang's supervisor, eligibility technicians had "a lot" of responsibility, and Hang was entrusted with screening, approving, verifying, and updating applications. In addition, the eligibility

7

technician was ultimately responsible for the accuracy of applicants' files, and he would decide who on the waiting list would receive an available house. Although Hang would eventually have to receive approval before actually renting a unit, his supervisors indicated that this process basically amounted to a pro forma affirmation of the eligibility technician's recommendations. In essence, then, Hang had primary authority for determining who would be the beneficiaries of federal funds. Obviously, this is an undertaking in which Hang could not have engaged had he not possessed some federal authority. See Velazquez, 847 F.2d at 142. Accordingly, we determine that Hang's job involved official federal responsibilities.

Because Hang occupied a position of public trust with official federal responsibilities, he was a public official for purposes of § 201. See Dixson, 465 U.S. at 496 ("Persons who hold such positions are public officials within the meaning of § 201 and liable for prosecution under the federal bribery statute."). Hang had "some degree of official responsibility for carrying out a federal program or policy," id. at 499, and we thus reject his assertion that the district court lacked jurisdiction over this case.

## B. The Subpoena Requests

Hang argues that the district court committed reversible error when it refused to honor his Rule 17 requests to issue certain subpoenas. As a preface to our consideration of Hang's allegations, it will be useful to examine the structure and development of Rule 17 of the Federal Rules of Criminal Procedure.

Rule 17 outlines the method by which the Government and criminal defendants may procure subpoenas from the district court. When a party requests a subpoena, subsection 17(a) directs the clerk to issue the subpoena "signed and sealed but otherwise in

blank," Fed. R. Crim. P. 17(a), to that party; the party will then fill in the omissions before service of the subpoena. To effectuate proper service, however, the party must include with the document the appropriate fee for one day's attendance at trial and a reimbursement for allowable mileage. If an individual has sufficient funds to satisfy these expenses, the entire process may be completed without any additional intervention by the court.

In many cases, though, a defendant cannot pay the requisite charges. Thus, Rule 17(b) offers a procedure through which indigent persons may acquire necessary subpoenas. Prior to 1966, this provision compelled destitute defendants to make the substantial showing that the requested evidence would be material and that the defendant could not safely go to trial without the witness. 2 Charles A. Wright, Federal Practice & Procedure § 272 (2d ed. 1982). In addition, the defendant was required to submit to the court an affidavit, available to the Government, naming the witness and describing the testimony the person would most likely give. Id. These burdens operated to discriminate against impoverished people because, in order to obtain needed testimony, indigent defendants were obliged to reveal to the Government the identity of witnesses and the defense's trial strategy. It is understandable, then, that this rule was the object of much criticism. One judge was moved to comment that "Rule 17(b) apparently presents an indigent with [a] Hobson's choice: either make no defense or disclose his whole case to the Government before his trial." Smith v. United States, 312 F.2d 867, 872 (D.C. Cir. 1962)(J. Skelly Wright, J., concurring in part and dissenting in part)(footnote omitted), quoted in United States v. Florack, 838 F. Supp. 77, 78 (W.D.N.Y. 1993).

The drafters of the Rule acted to ameliorate this inequity when, in 1966, they amended the provision to what is, in substance, its present day form. Under the modern version of the Rule, an indigent defendant is entitled to submit to the court, without

9

notice to the Government, an ex parte application for a witness subpoena. In order to obtain the subpoena, the defendant must only make a satisfactory showing that he "is financially unable to pay the fees of the witness and that the presence of the witness is necessary to an adequate defense." Fed. R. Crim. P. 17(b). This places all defendants, whether impoverished or with ample financial resources, on equal footing, and it prevents the Government from securing undue discovery.

Rule 17(c) addresses subpoenas duces tecum. The correct interpretation of this subsection is a point of dispute in this appeal. The Government argues that because this Rule, unlike Rule 17(b), does not specifically reference an indigent's right to make an ex parte application, the Rule cannot provide such a procedure for the issuance of subpoenas duces tecum. Hang counters that Rule 17(c) merely supplements Rule 17(b), and indigents are consequently authorized to privately petition the district court for the issuance of subpoenas for documents. We appear to be the first circuit court to confront this question, and the district courts that have considered the issue have reached conflicting results. Compare United States v. Jenkins, 895 F. Supp. 1389, 1395-97 (D. Haw. 1995)(finding that ex parte procedure applies to indigents' applications for subpoenas duces tecum) and Florack, 838 F. Supp. at 79-80 (same) with United States v. Hart, 826 F. Supp. 380, 381 (D. Colo. 1993)(reasoning in dicta that the ex parte procedure is not available when a defendant seeks the production of documents before trial) and United States v. Urlacher, 136 F.R.D. 550, 555-58 (W.D.N.Y. 1991)(reasoning that Rule 17 does not provide for ex parte application where a defendant desires pretrial production of documents, and that the procedure is probably not available for requests seeking the production of materials at trial).

We are persuaded by the well-reasoned analysis in Florack. That court focused upon the wording of Rule 17(c), emphasizing language which provides that a subpoena may "also" require a person

to produce documents.  The court elaborated:

> The word "also" suggests that the subpoena described above, that is in Rule 17(a) and Rule 17(b), in addition to requiring the person to attend, may <u>also</u> require that person to produce books, records, and documents. Therefore, Rule 17(c) should be interpreted in accordance with the provisions of Rule 17(a) and (b). . . . It is, o[f] course, true that Rule 17(c) does not specifically discuss a process for obtaining [document] subpoenas by an ex parte application.  It is also true, however, that the section does not describe <u>any</u> process for obtaining the subpoena.  Nothing in Rule 17(c) suggests that the initial application should be any different from the application for a subpoena which does not happen to require that the subpoenaed witness produce documents.

<u>Florack</u>, 838 F. Supp. at 79 (citations omitted).  The structure of Rule 17, then, indicates that an indigent may make an ex parte application for the issuance of a subpoena duces tecum.

Consequently, we conclude that an indigent defendant may, pursuant to Rule 17(c), make an ex parte request to the district court for issuance of a subpoena duces tecum.  <u>See</u> 2 Wright, <u>supra</u>, § 272 (2d ed. 1982 & Supp. 1995)("A district court seems clearly right in construing Rule 17(b) as applying to a subpoena duces tecum as well as to a subpoena to testify.").  This result, which is supported by principles of fundamental fairness and equality, is consistent with the objectives of the 1966 amendments to Rule 17. Having thus decided this issue,[3] we apply the requirements of Rule

---

[3]Hang contends that his conviction should be overturned because the district court wrongfully based its denial of his subpoena requests on his refusal to disclose the basis of the requests to the prosecution.  Of course, as we discussed above, an indigent defendant is entitled to petition the court ex parte for the issuance of subpoenas under Rule 17(b) and (c).  By giving Hang an opportunity to submit ex parte letters in support of the subpoenas, we believe that the court satisfied the Rule's requirement.  In addition, although the court may have made certain statements which, taken in isolation, might tend to indicate an improper reason for denying the requests, our reading of the entire record reveals that the court's refusal to honor the petitions was grounded primarily in Hang's complete failure to establish the

11

17 to the facts of this case.

### 1. The Witness Subpoena

On September 7, 1995, the day that the trial began, Hang petitioned the court to issue a subpoena for Hang Sao, the defendant's uncle. In an ex parte communication to the court, Hang's attorneys stated that Sao, who at the time of the request had recently returned from Minneapolis to his residence in Michigan, had assisted in the preparation of Hang's case. Furthermore, Sao, who was fluent in the Laotian language, had been present during defense counsel's attempts to interview Government witnesses, many of whom did not speak English. Although Hang's attorneys claimed these reasons justified issuance of the subpoena, the district court refused to honor the request.

We review a district court's decision whether to grant a request for a Rule 17(b) subpoena only for an abuse of discretion. United States v. LeAmous, 754 F.2d 795, 798 (8th Cir.), cert. denied, 471 U.S. 1139 (1985). The burden is upon the requesting party to show that the desired witnesses are necessary to an adequate defense, and reversal is only appropriate if "the exceptional circumstances of the case indicate that the defendant's right to a complete, adequate and fair trial is jeopardized." United States v. Wyman, 724 F.2d 684, 686 (8th Cir. 1984).

We believe that the district court correctly refused to issue the subpoena for Sao. While Sao's pretrial contributions were undoubtedly helpful to Hang, the defense utterly failed to establish that Sao's presence at trial was necessary to an adequate defense. Further, although Sao was bilingual and assuredly

---

necessary prerequisites to issuance of subpoenas. In any case, to the extent that the court may have based its denial of the requests on improper reasons, we find that error to be harmless.

12

assisted the defense during interviews with witnesses, the parties had already hired interpreters for the trial itself.  Sao had no personal knowledge of facts relevant to the charges in the indictment, and it is unclear what, if any, material testimony he could have offered.  Importantly, "Rule 17(b) was not promulgated to afford an indigent defendant a right to subpoena witnesses at Government expense whose testimony clearly would be lacking in materiality to the trial at hand."  Terlikowski v. United States, 379 F.2d 501, 508 (8th Cir.), cert. denied, 389 U.S. 1008 (1967).  Because Hang failed to carry his burden under Rule 17(b), the district court properly declined to issue the requested subpoena.

## 2.  The Subpoenas Duces Tecum

Hang also petitioned the district court, again on the first day of trial, to authorize the issuance of certain subpoenas duces tecum.  These broadly worded subpoenas, which were directed toward a hospital and various Government agencies, were primarily designed to uncover documents relating to the mental health of certain prosecution witnesses.  In an ex parte letter to the district court, Hang's attorney explained that he sought documents relating to one of Hang's accusers, Syphong Souvannarath, largely because she indicated during an interview that she had spent some time at the University of Minnesota Hospital and Clinic.  Further, based on nothing but sheer speculation, Hang requested documents which he felt might reveal that Ms. Souvannarath was defrauding the Social Security Administration.  In addition, Hang desired Government documents relating to his other accusers, even though the defense was admittedly "hard-pressed" to describe the information it hoped to discover in the materials.  After examining Hang's ex parte submission, the district court refused to authorize the issuance of the subpoenas.

We do not feel that the district court abused its discretion in declining to authorize the issuance of the subpoenas duces

13

tecum.  See United States v. Kalter, 5 F.3d 1166, 1169 (8th Cir. 1993)(stating that a decision whether to quash a subpoena for documents is committed to the district court's discretion).  The Supreme Court established long ago that Rule 17(c) "was not intended to provide an additional means of discovery."  Bowman Dairy Co. v. United States, 341 U.S. 214, 220 (1951).  Thus, in order to warrant the issuance of a subpoena duces tecum, a party must show that "(1) the subpoenaed document is relevant, (2) it is admissible, and (3) it has been requested with adequate specificity."  United States v. Arditti, 955 F.2d 331, 345 (5th Cir.)(citing United States v. Nixon, 418 U.S. 683, 700 (1974)), cert. denied, 113 S. Ct. 597 (1992); see also Kalter, 5 F.3d at 1169.  Notably, "[t]hese specificity and relevance elements require more than the title of a document and conjecture as to its contents."  Arditti, 955 F.2d at 345.  In our opinion, Hang failed to carry his burden as to any of these three elements.  To be sure, Hang's subpoenas did not even identify by name the documents desired, and his request is replete with conjecture as to the contents of the materials that might have turned up.

At most, Hang's broad request exemplified his "mere hope" that the desired documents would produce favorable evidence, and a Rule 17(c) subpoena cannot properly be issued upon a "mere hope."  See United States v. Cuthbertson, 630 F.2d 139, 146 (3d Cir. 1980)("We do not think that [a] 'mere hope' justifies enforcement of a subpoena under [R]ule 17(c)."), cert. denied, 449 U.S. 1126 (1981).  The district court correctly characterized Hang's subpoena request as a "pure total fishing expedition," and we therefore conclude that the court appropriately refused to authorize the issuance of the subpoenas duces tecum.

C.  Calculation of Benefit Received

In bribery cases, a district court must adjust the defendant's base offense level pursuant to the table contained in USSG §2F1.1

14

where "the value of the payment, the benefit received or to be received in return for the payment, or the loss to the government from the offense, whichever is greatest, exceeded $2,000." USSG §2C1.1(b)(2)(A). Here, because the bribes themselves involved relatively small sums, and as the Government evidently sustained no measurable loss, the district court, in adopting the Presentence Investigation Report, sentenced Hang based on the benefit received by his victims in return for their payments. Hang challenges the methodology employed by the district court in computing this value.

In making this computation, the district court initially determined that the value obtained by the victims was federally subsidized public housing. The court then ascertained the fair rental value for houses similar to the buildings acquired by the victims. By subtracting from this figure the rent actually paid by these individuals, the court derived the net monthly benefit received in exchange for the bribe. Because the victims might have stayed indefinitely within the federally subsidized homes, the court used one year as a baseline from which to determine the total actual benefit received. Thus, the court multiplied by twelve the net monthly benefit received by each victim. This yielded a total benefit of $33,660, which resulted in a four level increase in Hang's base offense level.

Hang's main objection to this calculation is his assertion that each of the victims was otherwise eligible for public housing. Therefore, according to Hang, the computation should be based on the money the housing recipients saved by more quickly accessing public housing. Hang's theory of the case, though, is inconsistent with the facts developed at trial. The accusations of Hang's victims were linked by a consistent theme, which is perhaps best exemplified by Syphong Souvannarath's statement that Hang told her "[i]f [she] didn't pay him, then [she] won't have home to live. [She] wouldn't get a house." This testimony demonstrates that Hang completely withheld public housing from certain Southeast Asian

15

individuals until they would pay him bribes.  The egregiousness of Hang's behavior is, if anything, underscored by the fact that the victims in this case were, indeed, eligible for public housing, for Hang manipulated his position to prevent them from receiving Government services to which they were entitled.

The value of the benefit received in exchange for a bribe is a factual finding that we review for clear error.  See United States v. Dijan, 37 F.3d 398, 403 (8th Cir. 1994), cert. denied, 115 S. Ct. 1418 (1995).  Consequently, we may reverse the sentence only if we are "left with the definite and firm conviction that the sentencing court erred."  United States v. Garrido, 995 F.2d 808, 812 (8th Cir.), cert. denied, 114 S. Ct. 331 (1993).  Additionally, the value of the benefit received need not be determined with precision.  See United States v. French, 46 F.3d 710, 715 (8th Cir. 1995)(stating that the amount of loss need not be determined with precision)(citing USSG §2B1.1, comment. (n.3)).  We cannot say that the district court committed clear error in calculating the benefit received in exchange for the victims' bribes,[4] and we thus affirm the four level increase in Hang's offense level assessed according to the table in USSG §2F1.1.

D.  Obstruction of Justice

Finally, Hang claims that the district court improperly imposed a two point enhancement under USSG §3C1.1 for obstruction of justice.  The district judge imposed this enhancement because of the harassment perpetrated by Hang's friends and family members against Government witnesses.  Hang contends that the Government did not introduce sufficient evidence to show that he willfully

_____

[4]Indeed, it appears that the district court's methodology was charitable to Hang.  For instance, though the court used one year as the baseline figure for determining the total value received, in this case each of the victims actually resided in federally subsidized housing for longer periods of time.

16

impeded the administration of justice by masterminding this odious scheme.

We review a district court's findings of fact in support of this enhancement for clear error. United States v. Grady, 997 F.2d 421, 425 (8th Cir.), cert. denied, 114 S. Ct. 416 (1995). Although we evaluate de novo the district court's application of the guidelines to the facts, we give due deference to the district court's application of the guidelines. United States v. Bellrichard, 62 F.3d 1046, 1050 (8th Cir. 1995), petition for cert. filed on Nov. 22, 1995 (No. 95-6845)(unreported). There is no evidence suggesting that Hang himself ever directly tormented Government witnesses. Still, under the guideline at issue, Hang is chargeable "for conduct that he aided or abetted, counseled, commanded, induced, procured, or willfully caused." USSG §3C1.1, comment. (n.7). We feel the testimony in this case, as adduced at trial and during the several related hearings, provided the district court with an adequate foundation from which it could logically infer that Hang was directing the nefarious activity of his confederates. We cannot say that the district court committed clear error when it found by a preponderance of the evidence that Hang engaged in conduct which justified the imposition of this enhancement.

## III.  CONCLUSION

Hang has failed to persuade us that any of his arguments merit reversal. Accordingly, we affirm his convictions for accepting a bribe as a public official in violation of 18 U.S.C. § 201(b)(2)(A), as well as the three concurrent thirty-three month terms of imprisonment imposed by the district court.

A true copy.

Attest:

17

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.