[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
08/26/99
THOMAS  K. KAHN
CLERK

_____

No. 98-2128

_____

D. C. Docket No. 5:97-CR-26-LAC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RONNIE BRUNSON KENNEY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(August 26, 1999)

Before ANDERSON, Chief Judge, BLACK, Circuit Judge, and FORRESTER*,
District Judge.

_____

* Honorable J. Owen Forrester, U.S. District Judge for the Northern District of Georgia,
sitting by designation.

PER CURIAM:

Ronnie Brunson Kenney appeals his conviction for soliciting a gratuity as a public official in violation of 18 U.S.C. § 201(c)(1)(B). On appeal, Appellant asserts that the District Court erred in denying his motion to dismiss due to pre-indictment delay; that the District Court erred in denying his motion to dismiss on the ground that he is not a "public official" as required by 18 U.S.C. § 201(c)(1)(B); that the trial court erred in denying his motion for a judgment of acquittal on the ground that the government failed to prove an allegation in the indictment; and that the trial court incorrectly charged the jury as to the definition of "public official" pursuant to 18 U.S.C. § 201(c)(1)(B). We conclude that Appellant's assignments of error are unavailing and therefore affirm his conviction.

I.     PROCEDURAL BACKGROUND

Appellant was charged in a three-count indictment arising out of the United States District Court for the Northern District of Florida, Panama City Division. In the indictment, Appellant was charged with three separate counts of soliciting a bribe as a public official in violation of 18 U.S.C. § 201(b)(2)(A). Prior to trial, Appellant filed two motions to dismiss the indictment. One of these motions was

based upon pre-indictment delay and the other was based upon the assertion that Appellant was not a "public official" as that term is defined by 18 U.S.C. § 201. United States District Judge Robert Hinkle deferred ruling upon these motions pending the presentation of evidence in the case.

On August 25, 1997, a jury was impaneled and trial began. At the close of the government's case, Appellant made a motion for a judgment of acquittal based upon the failure of the government to prove that he was a public official and that he was a "contract manager" as charged in the indictment. This motion was denied and trial proceeded. At the close of evidence, Appellant renewed his motion for a judgment of acquittal. The District Court again denied this motion and also denied the pending motions to dismiss.

On August 29, 1997, the jury returned verdicts of guilty of the lesser included offense of soliciting a gratuity under Counts 1 and 3 and not guilty as to Count 2. Appellant was sentenced on January 13, 1998 before Judge Hinkle. Appellant was sentenced to two concurrent terms of eighteen months of probation, ten months of which are to be served in home detention. In addition, Appellant was fined $40,000 and ordered to pay a $200.00 special assessment. The imposition of sentence was stayed pending appeal, and Appellant filed a timely notice of appeal on January 26, 1998.

## II. FACTS

### A. *The Edge-Marker Contract and Appellant's Duties with Respect to it*

Appellant was an employee of BDM International, Inc. ("BDM"), and his official job title was "Manager, Rapid Runway Repair Branch." BDM is a large publicly traded company that, among other things, does extensive government contract work with the Department of Defense. In 1988, BDM received a Systems Integration Support Contract from the United States Air Force. Pursuant to this contract, BDM provided manpower to supplement Air Force Functions. As part of the support provided, BDM supplied acquisition management and engineering personnel to assist the Air Force Civil Engineering Services Agency in procuring and approving materials and equipment. Pursuant to this general contract, BDM employees were assigned to assist in specific ongoing Air Force projects, or tasks.

In September of 1992, officials at Tyndall Air Force Base in Florida awarded a contract to Starflite Boats of Niceville, Florida, pursuant to which Starflite would provide the Air Force with a runway edge-marker system for its runway repair program. An edge marker is used to mark runway damage on a combat zone airfield and consists of a Styrofoam reflector mounted on top of a thirty inch by forty-eight inch rubber mat. Also, as part of the contract, Starflite was to ship the edge markers in wooden shipping containers intended to last fifteen

4

years.  As part of its bid, Starflite suggested the possibility of manufacturing more durable and less expensive boxes out of fiberglass.

After the contract was awarded, a post-award conference was held.  Among other things, the purpose of this meeting was to finalize the details of the performance of the contract, introduce the principal of Starflite, Mr. Brown, to the people with whom he would be working during the administration of the contract, and establish channels of communication.  The minutes from this conference show that it was chaired by Sue Harris, the Air Force contract administrator.  These minutes also show that the contracting officer for this contract was Larry G. Edwards, the project manager was Douglas A. Orlando, and Lt. Col. Michael C. Chatham was the officer in charge of the project.  All of these individuals were Air Force employees.  In addition, pursuant to the BDM-Air Force contract, Appellant was assigned by BDM to serve as its Acquisition Manager to support the performance of this contract.

At the post-award conference, Appellant was introduced to Mr. Brown as the day-to-day contact on the project, and Mr. Brown was told that if anything came up, he should contact Appellant.  (R2- 47.)  Mr. Brown was also informed that Appellant would serve as the "eyes and ears" of the Air Force during the administration of the contract and would report the status of the contract, progress

made, and any problems encountered by Starflite.  As a result, Mr. Brown believed that Appellant was the engineer on the project and had the authority to approve or disapprove most anything concerning the project.  (R2-46.)

In reality, as Acquisition Manager Appellant did not have final decision-making authority and could not bind the government.  He did, however, advise decision makers with respect to certain technical issues involved in the edge-marker contract.  According to the task description for this project, Appellant's job responsibilities included the provision of "program management, field test support, technical reviews and support for technical meetings when requested by the Chief, Airfield Systems Branch in support of the MOS Marking program." *See* Record Excerpt 773A.  In addition, testimony at trial described Appellant's role, variously, as:  Providing "technical data . . . to the people in the government who were making decisions regarding the procurement" and to provide advice based upon that information (R4-489-91; R5-636); processing or evaluating information for use by others in making official government decisions (R4-492; R5-636); functioning as the "eyes and ears" for the Air Force throughout the performance of the contract (R4-519; R3-238); ensuring that the contractor used specified products in the prescribed manner to get the prescribed product, or, in other words, managing the performance of the contract (R2-47); and providing technical advice

to support the government in their acquisition of civil engineering systems for the Air Force. (R3-342). Ms. Harris also testified that Appellant held a position of official federal trust. (R3-269.)

In addition, the testimony indicates that Appellant's recommendations and advice were given great weight by those Air Force officials in the position to make procurement decisions. (R3-238; R3-331; R4-512-13.) The evidence shows that, on at least one occasion, Ms. Harris adopted Appellant's recommendation. Appellant had input in at least two decisions to substitute equivalent components. (R2-71; R3-329-30.) Also, Mr. Brown testified that when he spoke to Ms. Harris and Mr. Edwards about substituting an equivalent rubber mat for that specified in the contract, both stated that the approval of the equivalent would be Appellant's decision. Finally, although Appellant's salary was not paid by Air Force, testimony indicates that his salary is paid by BDM directly from funds it receives from the government in payment for services under the contract. (R3- 352.)

B.    *The Solicitations*

It is alleged in the indictment that in November of 1992, Appellant suggested to Mr. Brown that Mr. Brown could cut costs by using a different brand of rubber mats than that specified in the contract. Appellant offered to approve the change if Mr. Brown would pay him one-half of the cost savings. In addition, in

March of 1992, Appellant and Mr. Brown discussed Mr. Brown's preference for using cheaper fiberglass shipping boxes rather than the wooden ones specified in the contract. Again, Appellant told Mr. Brown he could have the contract modified if Mr. Brown would pay him $100.00 per box. At a later date, the contract was in fact modified to allow for the use of the fiberglass boxes. Further, an equivalent mat was eventually used, although not the original equivalent sought by Mr. Brown. Mr. Brown, however, never paid the above-described sums. Instead, he reported Appellant's solicitations to Air Force officials.

After Mr. Brown's report, the Federal Bureau of Investigation (FBI) and the Air Force conducted a joint investigation and on May 24, 1993 recorded an incriminating conversation between Mr. Brown and Appellant on both video and audio tape. Thereafter, the investigation was put on hold for the duration of the contract because law enforcement officials wanted to observe Appellant actually receiving illegal payments. The investigation was also delayed due to health problems suffered by Appellant. Eventually, however, investigators closed the investigation in late 1996 and Appellant was indicted on June 26, 1997. Count one of the indictment related to the change in the contract specifications regarding rubber mats; count two alleged a general promise by Appellant to direct Air Force

8

business to Starflite Boats in return for cash payments; and count three pertained to the change in the contract specifications regarding fiberglass boxes.

III.   DISCUSSION

Appellant's first and third enumerations of error regarding the pre-indictment delay and the failure of the government to prove an allegation in the indictment are meritless and may be disposed of without discussion.  Appellant's contentions regarding his motion to dismiss and the jury instructions, however, require a bit more attention.

A.      *Denial of the Motion to Dismiss*

As stated above, in his first enumeration of error, Appellant contends that the district court improperly denied his motion to dismiss on the grounds that he is not a "public official" as defined by the statute under which he was convicted.

18 U.S.C. § 201 provides that it is unlawful for a "public official" to, among other things, demand, seek, or accept anything of value in return for being influenced in an official act.  *See* 18 U.S.C. § 201(b)(2).  This statute also makes it illegal to seek, receive, or accept anything of value for or because of an official act performed or to be performed.  *See* 18 U.S.C. § (c)(1)(B).  The term "public official" is defined as:

9

Member of Congress, Delegate, or Resident Commissioner, either before or after such official has qualified, or an officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof, including the District of Columbia, in any official function, under or by authority of any such department, agency, or branch of Government, or a juror.

18 U.S.C. § 201(a)(1).

In *Dixson v. United States*, 465 U.S. 482 (1984), the Supreme Court held that this definition extends beyond merely government employees and contractors to include private individuals who "occupy a position of public trust with official federal responsibilities." *Id*. at 496. Such an individual, however, "must possess some degree of official responsibility for carrying out a federal program or policy" to be considered a public official. *Id*. at 499.

In the instant case, Appellant contends that he did not occupy a position of public trust with official federal responsibilities. Appellant bases this contention on the fact that his job merely consisted of "making non-binding recommendations based on technical data." Appellant's Brief at 30. In addition, Appellant points out that he was not in a position to authorize changes in the contract or make decisions binding on the government and relies upon internal Department of

Defense Policies that identify "inherently governmental functions" that may not be delegated to private contractors such as himself.

Although this circuit has not addressed the scope of the term "public official" in circumstances such as these, the findings of several of our sister circuits are instructive. In *United States v. Hang,* 75 F.3d 1275 (8th Cir. 1996), the Eighth Circuit found that an eligibility technician for an independent public corporation organized under Minnesota law and established for the purpose of administering federal programs and funds was a public official. The defendant's duties in *Hang* included screening applications to verify whether the applicants were entitled to preferences for low-income housing and placing them on a waiting list. The defendant did not, however, have authority actually to rent an apartment. In affirming the defendant's conviction for receiving bribes in exchange for accelerating the application process, the Eighth Circuit found that the defendant occupied a position of public trust in that he was "on the front line in the effort to provide affordable housing to eligible families." *Id.* at 1280. In addition, the court held that the defendant's job involved official federal responsibilities in that the agency he worked for was organized for the exclusive purpose of implementing federal programs; was subject to federal oversight; and the defendant himself had a great deal of responsibility in determining who would receive available housing in

11

that he was ultimately responsible for the accuracy of the applicants' files and the approval of his recommendations were largely *pro forma*. *Id*.

Similarly, in *United States v. Madeoy*, 912 F.2d 1486 (D.C. Cir. 1990), *cert. denied*, 498 U.S. 1105 (1991), the District of Columbia Circuit upheld the conviction of a VA-approved fee appraiser for accepting bribes as a public official. The defendant in *Madeoy* conducted real estate appraisals for the purpose of obtaining Federal Housing Administration-insured loans. Despite the existence of a VA regulation stating generally that appraisers are not agents of the government and had no authority to bind the government, the court found the defendant to be a public official. In so finding, the court noted that it was on the defendant's recommendation, subject to only limited review, that the government guaranteed loans. *See also United States v. Velazquez*, 847 F.2d 140 (4th Cir. 1988) (applying the statute to a county deputy sheriff who was responsible for supervising federal inmates); *United States v. Strissel*, 920 F.2d 1162, 1165-66 (4th Cir. 1990) (finding the executive director of a local housing authority to be a public official); *United States v. Ricketts*, 651 F. Supp. 283 (S.D.N.Y. 1987) (applying the statute to a supervisor in an organization that contracted with the Bureau of Prisons).

These cases make it clear that in order to be considered a public official a defendant need not be the final decision maker as to a federal program or policy.

Rather, it appears to be sufficient that the defendant is in a position of providing information and making recommendations to decision makers as long as the defendant's input is given sufficient weight to influence the outcome of the decisions at issue. Based upon such reasoning, this court finds that Appellant was indeed acting as a public official.

Appellant's position was one of public trust in that his advice and the information he provided was relied upon by officers of the Air Force in making decisions pertaining to the procurement of equipment. In addition, it is clear from the record that Appellant acted as the primary liaison between Starflite and the Air Force and could not have done so without some federal responsibility. Appellant's job also included federal responsibilities in that he was responsible for monitoring and providing information regarding the technical aspects of the edge-marker contract. In providing such information, the evidence shows that his opinion was highly regarded, the decision makers relied upon his technical expertise and deferred to him on many day-to-day decisions. Like the defendants in *Hang* and *Madeoy*, although Appellant did not exercise the final judgment on contracting decisions, the information and recommendations he provided served as the basis for many of those decisions. As a result, it is clear that, in the performance of his

duties, Appellant had some official responsibility for the carrying out of a government program.

Nor does the existence of the Department of Defense policies relied upon by Appellant alter this conclusion. These policies do not purport to define what is an official responsibility as that term is used in § 201. Rather, they merely provide guidance as to what functions must be performed by government employees and those that may be out-sourced to contractors such as Appellant. Therefore, they do not provide any guidance as to whether the functions performed by Appellant can be seen as including federal responsibility. As a result, the court hereby AFFIRMS the district court's denial of Appellant's motion to dismiss.

B.     *Jury Instructions*

Appellant's final enumeration of error alleges that the jury instructions inaccurately stated the law with respect to the definition of "public official." The court first notes that it is unclear whether the question of Appellant's status as a public official is a question of fact that should have been submitted to the jury at all, or, instead, is a question of law that should have been decided by the district court. If this determination is indeed one of law to be made by the judge, the submission of the question to the jury was unnecessary, and the propriety of the jury instructions need not be reached. This circuit has not spoken on the issue.

14

Those circuit courts that have decided the issue have found that the determination of whether a defendant is a public official subject to § 201 is a question of law. *See Madeoy*, 912 F.2d at 1494 (finding this to be a legal question to be decided by the district court); *Hang*, 75 F.3d at 1279 (stating that this is a question of law and therefore reviewing the issue de novo). We find that it is unnecessary to resolve this issue in the instant action, however, as a review of the instructions given shows that they were an accurate reflection of the law.

In *United States v. Trujillo*, 146 F.3d 838, 846 (11th Cir. 1998), this court held that a deferential standard of review is to be applied to the district court's jury instructions. If the instructions accurately reflect the law, the trial judge is given wide discretion in determining the style and wording of the instruction and this court will only review them for an abuse of that discretion. *Id.* The district judge in the instant case drafted jury instructions on the definition of a public official that combine some aspects from the statutory definition of the term with elements from the case law and hypothetical examples. Specifically, the jury was instructed:

> A "public official" . . . is any person who acts for or on behalf of the United States, that is, a person who possesses some degree of official responsibility for carrying out a federal program or policy. This includes someone who, acting for or on behalf of the government,

either (a) makes official governmental decisions himself or herself, or (b) makes recommendations regarding official governmental decisions, or (c) processes or evaluates information for use by others in the making of official governmental decisions.

A "public official" need not be an employee of the federal government or of any government at all; a person who acts for or on behalf of the federal government pursuant to a contract or other business relationship can be a "public official," just as a government employee can be a "public official." The term "public official" thus includes an employee of a private corporation who acts for or on behalf of the federal government pursuant to a contract.

Record Excerpt 26 at 10.

Appellant asserts that examples (b) and (c) above are vague, open-ended, and left the jury no choice but to find him to be a public official. We concede that these examples could be construed as overbroad. When read in conjunction with the preceding language requiring the jury to find that Appellant possessed some official responsibility, however, we find that they accurately reflect the meaning of "public official" as we have construed that term above. Accordingly, although the

16

jury instructions may not be as precise as we would like, we cannot say that the district judge abused his discretion in this regard.

V.    CONCLUSION

After careful consideration of the arguments presented on appeal, we conclude that Appellant is not entitled to relief.  Accordingly, we AFFIRM the findings of the district court.