**UNITED STATES of America,**

v.

**Steven F. MADEOY, et al., Appellants.**

**Nos. 87–3085, 87–3086 and 87–3088.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 22, 1989.

Decided Aug. 10, 1990.

Rehearing and Rehearing En Banc Denied Oct. 16, 1990.

James Hamilton, appointed by this Court, with whom Mary C. Albert was on the brief, for appellants Steven F. Madeoy and Jakey Madeoy in 87–3085 and 87–3086.

John W. Vardaman, appointed by this Court, with whom John P. Monahan was on the brief, for appellant Michael J. Friedman in 87–3088.

Thomas C. Black, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Asst. U.S. Atty., were on the brief for appellee in all cases. Steven C. Tabackman and Donald J. Allison, Asst. U.S. Attys., also entered appearances for appellee.

Before EDWARDS, WILLIAMS, and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Appellants Steven Madeoy, Jakey Madeoy, and Michael Friedman were indicted for their participation in a scheme to defraud the Federal Housing Administration. The indictment alleged that the appellants and others unjustly and illegally [enriched] themselves ... by receiving money from and on account of FHA-insured loans which were fraudulently obtained as a result of the bribery of public officials and the knowing submission of false, fraudulent, and misleading statements to the FHA and to the [Veterans Administration].

Each of the three appellants was charged with one count of conspiracy (18 U.S.C. § 371), and one count of participating in the conduct of the affairs of an enterprise through a pattern of racketeering activity (18 U.S.C. § 1962(c) (RICO)). Steven Madeoy and Michael Friedman were charged with 14 counts of giving a bribe to Jakey Madeoy, a VA fee appraiser, and he was charged with 14 counts of accepting a bribe (18 U.S.C. § 201(b), (c)). Steven Madeoy and Michael Friedman were charged with 45 counts of making "false, fictitious or fraudulent statements or representations" to the Department of Housing and Urban Development and to the VA (18 U.S.C. § 1001), 12 counts of wire fraud (18 U.S.C. § 1343), and 11 counts of interstate transportation of property obtained by fraud (18 U.S.C. § 2314 (ITPOF)). Jakey Madeoy was also charged with 22 counts of making false statements to the VA (18 U.S.C. § 1001). The indictment sought forfeiture under RICO (18 U.S.C. § 1963(a)(1), (3)), of various properties allegedly acquired by the defendants through their racketeering activity.

The evidence at trial showed that Steven Madeoy entered into purchase contracts with the owners of 23 properties and then listed those properties for resale with a real estate brokerage. The brokerage found a prospective purchaser for each property and referred him to a mortgage company, which in turn prepared mortgage insurance applications and submitted them to the FHA. In order for the FHA to determine the amount of the loan that it would insure, it required an appraiser to estimate the value of a property; for 22 of the properties, Jakey Madeoy, a VA-approved fee appraiser, performed that function. For each property, he submitted to the VA a Residential Appraisal Report with an inflated appraisal, upon which the VA relied in issuing a Certificate of Reasonable Value. The FHA, in turn, relied upon the Certificate in issuing a conditional insurance commitment for each of the properties.

Following receipt of the FHA's conditional commitment, settlement took place through Michael Friedman's law office, and the mortgage company transferred the loan proceeds to Friedman's escrow account, either by interstate wire or by interstate mail. Friedman then falsified the closing documents in order to indicate that each purchaser had made the required minimum down-payment on the property. He also impermissibly disbursed the loan proceeds to various participants in the scheme. Through the scheme Steven Madeoy received $199,860 of the loan proceeds; Jakey Madeoy received $14,042; and Michael Friedman received $20,696.

The jury returned guilty verdicts against all three appellants. Steven and Jakey Madeoy were each convicted on all counts other than one bribery count and two false statement counts; Michael Friedman was convicted on all counts other than one bribery count. Following a separate deliberation, the jury returned a special verdict requiring each appellant to forfeit various properties pursuant to the RICO count.

The district court sentenced each defendant to a period of incarceration and ordered each to pay a special assessment, make restitution, and, pursuant to the RICO count, forfeit the assets identified by the jury.

The appellants raise numerous challenges to their convictions and to the forfeitures ordered by the district court.. After reviewing their principal challenges below, and having considered their other arguments, we conclude that the district court committed no reversible error. We therefore affirm the convictions on all counts.

## I.  GRAND JURY BIAS

We address first the appellants' claim that their indictment must be dismissed due to racial bias on the part of some members of the grand jury that indicted them. Because we conclude that the appellants waived their claim by failing to file a timely motion to dismiss the indictment under Federal Rule of Criminal Procedure 12(b), and that the district court did not abuse its discretion in declining to grant relief from this waiver under Rule 12(f), we reject the claim without considering its merits.

### A.  *The Grand Jury Proceedings*

During the two year-long grand jury proceeding, three grand jurors made remarks suggesting that they harbor racial prejudice against white people (such as the appellants). The Assistant U.S. Attorneys (AUSAs) presenting the case to the grand jury failed to caution the jurors that such remarks were inappropriate and that racial prejudice could play no role in their determination of whether to return an indictment; one of the prosecutor's comments could even be interpreted as an endorsement of race prejudice.

The first exchange occurred after the jury learned that most of the people who, at the instance of Steven Madeoy, purchased properties, or in whose names properties were purchased, were black:

FIRST JUROR: But the money ended up in the white people's pocket....

SECOND JUROR: As always.

FIRST JUROR: As always.

AUSA: That's correct.  Are there any further questions?

The second exchange, which occurred two months later, involved the deputy foreperson and a black witness:

DEPUTY: You mean to say these people didn't look at this piece of property?

WITNESS: Half of them didn't know. No, they didn't....

DEPUTY: I can't even believe that.

WITNESS: You'd be surprised what people will do for money.

DEPUTY: And you being black all your life and you know that the white man takes you any damn time he can and you don't look to see?

WITNESS: Miss, I'll tell you what— (GENERAL LAUGHTER)

The third incident took place a week after the second:

DEPUTY: I sympathize with you, but I have a question.  They're going to get mad with me when I say this.

JUROR: You're probably right.

DEPUTY: You know, we've been—we were born black, you know.

WITNESS: Definitely.

DEPUTY: How could you have trusted them so?

### B.  *The District Court's Decision*

Four business days after the trial started, the appellants filed a motion to dismiss the indictment due to grand jury racial bias or, alternatively, for a voir dire of the grand jurors in order for the court to determine "the exact role that racial prejudice played in the return of the Indictment." The court later denied the motion, noting that the defendants filed it "almost a week after the trial began, entirely out of compliance with [Rule 12]." The court acknowledged that "counsel for one of the defendants made oral reference to the grand jury remarks on the first day of trial, just before the voir dire was about to begin." It went on to observe that "that reference was not framed in terms of an attack on the grand jury or the indictment but rather

in terms of a proposal for voir dire questions to the petit jury. Thus, the Court had neither a written nor an oral challenge to the indictment before it at that time." The court therefore concluded:

> Although categorization of individuals based on their race or color is certainly to be condemned, in the context of facts here the references do not demonstrate such bias by the grand jury as a body that, especially in view of the belated defense effort to raise the issue, either a dismissal of the indictment or a voir dire of last year's grand jury is required.

### C. Analysis

The appellants' claim is clearly subject to the requirements of Rule 12: "By its terms, [the Rule] applies to both procedural and constitutional defects in the institution of prosecutions which do not affect the jurisdiction to the trial court." *Davis v. United States*, 411 U.S. 233, 236–37, 93 S.Ct. 1577, 1579–80, 36 L.Ed.2d 216 (1973). Rule 12(b) provides: "Defenses and objections based on defects in the indictment or information" "must be raised prior to trial." Per Rule 12(f), "Failure by a party to raise defenses or objections or to make requests which must be made prior to trial ... shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver."

■ We agree with the district court that the appellants' failure to object to the indictment prior to trial constituted a waiver of their claim of grand jury bias. Even assuming that Rule 12 does not require a "writing or formally denominated" motion, *United States v. Oaks*, 508 F.2d 1403, 1404–05 (9th Cir.1974), the appellants failed to comply with the substance of the rule. Our review of the relevant portions of the transcript leaves no doubt that, although the grand jurors' apparent bias was discussed briefly just before the trial began, none of the defendants challenged the indictment upon that basis.

We need not decide whether, as the Government maintains, the district court's conclusion that the objection was not raised before trial is subject to review only for clear error. Regardless of how much or little deference we owe to the district court, we could not disagree with its conclusion that, under Rule 12, the appellants waived their objection to the grand jury proceedings.

We turn, therefore, to the question whether the district court, "for cause shown," should have "grant[ed] relief from the waiver," pursuant to Rule 12(f). The decision whether to grant such relief is "within the sound discretion of the trial judge," and "will be disturbed on appeal only for clear abuse of discretion." *United States v. Rodriguez*, 738 F.2d 13, 16 (1st Cir.1984); *see also Davis*, 411 U.S. at 245, 93 S.Ct. at 1584.

■ In deciding whether to grant relief from a Rule 12 waiver, a district court should take into account the reason for the defendant's tardiness and whether he has shown that he is actually prejudiced by the defect in the indictment of which he complains. *See id.* at 243–45, 93 S.Ct. at 1583–84; *Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 361–63, 83 S.Ct. 448, 460–61, 9 L.Ed.2d 357 (1963). The Supreme Court has left open whether the defendant must always show both excuse for his noncompliance with Rule 12(b) and actual prejudice, or whether a court should somehow balance these factors in deciding whether the defendant has shown "cause" for relief from waiver under Rule 12. *Murray v. Carrier*, 477 U.S. 478, 494, 106 S.Ct. 2639, 2648, 91 L.Ed.2d 397 (1986). Since we are not persuaded by the appellants' arguments with respect to either prejudice or excuse, however, we need not resolve that issue today.

■ By way of excuse, the appellants argue that they had at most ten days in which to sift through a large amount of Jencks Act material. (During the ten days prior to trial, the Government gave the appellants about 2000 pages, in installments, the last of which was apparently received on the Friday before the Tuesday when the trial started.) The problem of dealing with a large volume of material in a short period of time before a complex

trial begins is not uncommon, however. We must therefore look skeptically upon the appellants' claim, lest the pressure inherent in a criminal proceeding becomes a tool by which a defendant can disrupt his trial. As the Supreme Court stated in *Davis*, "If defendants were allowed to flout [Rule 12's] time limitations, ... there would be little incentive to comply with its terms when a successful attack might simply result in a new indictment prior to trial. Strong tactical considerations would militate in favor of delaying the raising of the claim...." 411 U.S. at 241, 93 S.Ct. at 1582. A defendant who receives Jencks Act material only after his trial has begun, and is thus first apprised of the facts upon which his motion to dismiss the indictment is based, may be in a position to argue good cause for his failure to have moved for dismissal prior to trial. The appellants in this case, however, not only had the material, but had concededly discovered the offensive comments before trial, notwithstanding the time pressure during the preceding ten days; that time pressure cannot, therefore, excuse their failure to make a motion on the morning that the trial began.

With respect to prejudice, the appellants contend that they do not have to show actual prejudice because, under *Vasquez v. Hillery*, 474 U.S. 254, 260–64, 106 S.Ct. 617, 621–23, 88 L.Ed.2d 598 (1986), prejudice is presumed when a defendant is indicted by a racially biased grand jury. In *Hillery*, racial bias had been a factor in determining the composition of the grand jury. Even if the presumption of prejudice in a compositional case would otherwise carry over to one in which a constitutionally composed jury is marred by exposure to the racially biased remarks of a few individual grand jurors, *Hillery* is inapposite to this case for the simple reason that the motion to dismiss the indictment in *Hillery* was timely-filed. As the Supreme Court stated in *Davis*, "The presumption of prejudice which supports the existence of the right [to a constitutionally-composed grand jury] is not inconsistent with a holding that actual prejudice must be shown in order to obtain relief from a statutorily provided waiver for failure to assert it in a timely manner." *Davis*, 411 U.S. at 245, 93 S.Ct. at 1584. *Davis* thus strongly suggests that relief from a Rule 12(b)(2) waiver is indicated only upon the defendant's showing actual prejudice.

The appellants have made no showing of actual prejudice. They point to three isolated remarks made in the course of two years of hearings—hardly enough to make it likely that, but for the remarks, the grand jury would not have indicted them on the same counts.

Because we find that the appellants have shown neither cause for the untimeliness of their motion, nor actual prejudice from its denial, we conclude that the district court did not abuse its discretion in refusing to relieve them from their waiver of the right to challenge their indictment. We therefore do not reach the merits of the appellants' constitutional claim.

We pause, however, to make clear that, despite our determination that the appellants have failed to show actual prejudice, we in no way condone the racial bias revealed in the comments made during the grand jury proceedings. We are troubled not only by the grand jurors' remarks, but more so by the failure of the AUSAs who were present to admonish the speakers and to make clear that any biases that they harbor must play no role in the matter at hand. Such official complacency, perhaps even opportunism, when racial bias infiltrates the criminal justice system, is not tolerable. While the appellants appear not to have been victimized by it, the public suffers whenever the appearance of racial bias goes uncorrected in the courthouse.

## II. THE WIRE FRAUD AND ITPOF INSTRUCTIONS

The appellants contend that their wire fraud and ITPOF convictions must be overturned because the district court's instructions allowed the jury to convict them for defrauding the Government of "intangible rights," and without finding that the Government was defrauded of money or property, contrary to the Supreme Court's teaching in *McNally v. United States*, 483

U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). We reject this claim because we find that, as a whole, the indictment, the evidence, and the jury instructions leave no doubt that the defendants were convicted upon the basis of a proper legal theory. In light of this conclusion, we need not and do not decide whether *McNally* applies to an ITPOF offense. (We note that *McNally* has been overruled by legislation. In November 1988, after the events giving rise to the appellants' convictions, the Congress amended the wire fraud statute to provide that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.)

■ The wire fraud and ITPOF counts of the indictment charged Steven Madeoy and Michael Friedman with devising

> a scheme and artifice to defraud the FHA and the VA of their lawful right to conduct their business and affairs free from deceit, fraud, misrepresentation, and theft *and* to defraud and obtain money and property from the FHA by means of false and fraudulent pretenses, representations, and promises which defendants well knew were false when made.... (Emphasis added.)

The district court instructed the jury regarding these counts:

> With respect to the first element, the Government must prove beyond a reasonable doubt the existence of a scheme or artifice to defraud, with the objective *either* of defrauding the FHA or the VA of their lawful right to conduct their business and affairs free from deceit, fraud, or misrepresentation, *or* of obtaining money and property from the FHA by means of false and fraudulent representations and promises which the defendant knew to be false. (Emphases added.)

And:

> In order to establish a scheme to defraud, the Government is not required to establish that a defendant himself originated the scheme. Nor is it necessary that a defendant realized any gain from the scheme nor that the intended victim

suffered any loss as long as you find the existence of a scheme to defraud.

The wire fraud statute does not prohibit a person from participating in a scheme that is aimed solely at defrauding "the citizens and government ... of certain 'intangible rights,' such as the right to have the [Government's] affairs conducted honestly." *McNally*, 483 U.S. at 352, 107 S.Ct. at 2877 (interpreting mail fraud statute); *see Carpenter v. United States*, 484 U.S. 19, 25–28, 108 S.Ct. 316, 320–21, 98 L.Ed.2d 275 (1987) (extending *McNally* to wire fraud statute). The statute does, however, protect intangible property, as well as the right to decide how to use that property— even if a defendant's actions do not cause the property owner any monetary loss. *Id.*

We reject the appellants' contention that the indictment did not charge a scheme or artifice to defraud a victim of property. An FHA insurance commitment, by which the Government promises to pay the lender if the borrower defaults on the loan, is a "property interest," not an "intangible right" under *McNally* and *Carpenter*, because it involves the Government's "control over how its money [is] spent." *McNally*, 483 U.S. at 360, 107 S.Ct. at 2882. Moreover, the indictment alleged that the appellants' scheme resulted in the Government's committing itself to pay back certain loans, which it would not otherwise have agreed to do, thereby causing it to lose money; the indictment also alleged that the appellants' object was to reap financial gain from the scheme. The indictment therefore alleged a scheme for which the jury could properly convict them of wire fraud and ITPOF.

Our decision does not conflict with those of courts that have held that a government's right to issue a license is not its property. *See United States v. Kato*, 878 F.2d 267, 268–69 (9th Cir.1989) (FAA's right to issue a private pilot license); *United States v. Dadanian*, 856 F.2d 1391, 1392 (9th Cir.1988) (state's right to issue gambling license); *United States v. Murphy*, 836 F.2d 248, 253–54 (6th Cir.1988) (state's right to issue bingo license). Under those decisions, wrongful issuance of a license infringes an intangible interest in respon-

sible government, and thus conviction for bringing about such issuance is impermissible under *McNally*. In contrast, the FHA's commitment to guarantee a loan is a significant liability to the Government and the commitments obtained by the appellants have, in fact, cost the Government money.

■ We reject also the appellants' claim that the jury instruction on the wire fraud and ITPOF counts requires reversal of their convictions. The appellants did not object to the instructions at trial, and they are consequently barred from challenging them here except for "plain errors or defects affecting substantial rights," under Rule 52(b). *See United States v. Debango*, 780 F.2d 81, 84 (D.C.Cir.1986). In this context, they would have to show either that an error in the charge was so substantial that, despite all of the instructions, arguments, and evidence properly before the jury, "it affects the very integrity of the trial process," *United States v. Blackwell*, 694 F.2d 1325, 1341 (D.C.Cir.1982), or "indicates that a serious injustice was done," *United States v. Baker*, 693 F.2d 183, 187 (D.C.Cir.1982).

We may assume that the disjunctive in the trial court's instruction to the jury was incorrect in light of *McNally*, because it suggested that the jury could still convict even if it concluded that the defendants sought only to defraud the Government of its "lawful right to conduct [its] business and affairs free from deceit, fraud, or misrepresentation." This does not, however, amount to "plain error"; considered together, the jury instructions, the indictment, and the evidence compel the conclusion that the appellants were not convicted upon the basis of an improper legal theory.

The instructions as a whole fairly informed the jury that, in order to convict, it had to find more than a scheme to defraud the FHA of the right to conduct its business free from deceit. For example, immediately following the erroneous instruction, the court explained that "[a] scheme or artifice includes any plan or course of action to deceive others and to obtain money or property from persons so deceived by false and fraudulent pretenses, representations or promises." The court also told the jury that the alleged scheme related to the issuance of Certificates of Reasonable Value, which were used by the Government to decide whether and for how much to guarantee the loans for the 23 properties, and that in order to find the intent needed to convict, it had to conclude that the appellants "act[ed] knowingly and with the specific intent to deceive for the purpose of either causing some financial loss to another or bringing about a financial gain to [themselves]."

These instructions, along with the jury's conclusion beyond a reasonable doubt that the appellants engaged in the conspiracy with which they were charged, makes it simply impossible to imagine how the jury could have concluded that the scheme was not directed at defrauding the Government of a property interest. Thus, *United States v. Slay*, 858 F.2d 1310, 1314–17 (8th Cir.1988), and *United States v. Ochs*, 842 F.2d 515, 521–24 (1st Cir.1988), upon which the appellants rely, are not on point; in those cases the defendants could have committed all of the acts alleged and yet not have defrauded anyone of property. The only possible theory upon which the jury could have returned the guilty verdicts in this case is that the appellants participated in a scheme fraudulently to obtain FHA-insured loans, to their financial benefit or the Government's financial loss. Inasmuch as this theory involves fraudulently obtaining a "property interest" under *McNally*, we conclude that the erroneous instruction did not constitute plain error.

Contrary to the appellants' separate assertion, the district court was not required to instruct the jury that it must find that the Government actually lost any money as a result of the appellants' scheme. In *Carpenter*, a newspaper lost the exclusive ability to decide how to use its confidential information; that was sufficient, although no financial loss was involved, to satisfy the property requirement. 484 U.S. at 27–28, 108 S.Ct. at 321. There is no logical way to interpret the guilty verdicts here other than indicating that the jury conclud-

ed that the Government lost the ability to identify and avoid unworthy loan guarantee applications—something at least as substantial as the property in *Carpenter*—and of course it also lost money once the borrowers started defaulting.

Because we conclude that the Government properly alleged violations of the wire fraud and ITPOF statutes, and that the district court's instructions did not constitute plain error, we affirm the convictions on those counts.

### III. "Public Official" Under the Bribery Statute

The bribery statute defines a "public official" as an

> officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof ..., in any official function, under or by authority of any such department, agency, or branch of Government.

18 U.S.C. § 201(a)(1). The appellants challenge their bribery convictions on the ground that the court improperly instructed the jury, as a matter of law, that a VA fee appraiser is a "public official," thus denying them their right to have the jury resolve every question of fact beyond a reasonable doubt. They also argue that, pursuant to the rule of lenity, we should interpret the assertedly ambiguous language of the statute to mean that a VA fee appraiser is not a public official. We agree with the district court, however, that a VA fee appraiser is a public official under the bribery statute, as a matter of law.

### A. *Fact or Law*

■ In *Dixson v. United States*, 465 U.S. 482, 484, 104 S.Ct. 1172, 1173, 79 L.Ed.2d 458 (1984), the Supreme Court held that, for purposes of the federal bribery statute, the "officers of a private, nonprofit corporation administering and expending federal community development block grants are 'public officials.'" The appellants assert that, because the district court in *Dixson* had submitted this issue to the jury, it must be a question of fact and not of law.

Nothing in the Supreme Court's decision in *Dixson* remotely supports this reasoning. The Court did not address the procedure used by the district court, and it never referred to the jury's determination or suggested that it was reviewing the "evidence" for the proposition that the defendants were public officials. On the contrary, the Court reached its conclusion through an exercise in statutory interpretation, which conclusively shows that this is not a question for the jury. For example, it considered the nature of the defendants' positions in relation to Congress's intent, as evidenced by the legislative history of the federal bribery statute. *Id.* at 496–98, 104 S.Ct. at 1179–80. Therefore, we hold that whether an individual is a public official within the meaning of the statute is a question of law, and as such, a matter for judicial resolution, *see Caldwell v. United States*, 218 F.2d 370, 372 (D.C.Cir.1954).

### B. *Fee Appraisers as Public Officials*

■ In *Dixson* the Supreme Court interpreted the term "public official" to mean a person who "occupies a position of public trust with official federal responsibilities." 465 U.S. at 496, 104 S.Ct. at 1180. The Court made clear, however, that "employment by the United States or some other similarly formal contractual or agency bond is not a prerequisite" to an individual's being a public official. *Id.* at 498, 104 S.Ct. at 1181.

A VA fee appraiser falls within both the plain language, and the Supreme Court's interpretation, of the bribery statute. In the Court's terms, he has "official federal responsibilities": it is upon his recommendation, subject to minimal review, that the Government guarantees a loan. And his is a "position of public trust": a fee appraiser must certify that he knows the applicable regulations and must promise not to accept any assignment for which he has a conflict of interest or to take any payment other than the appraiser's fee set by the Government. Jakey Madeoy, as a VA fee appraiser, was therefore a "person acting for or on behalf of [an] agency ... in [an] official function, under or by authority of any such

... agency," *i.e.,* a "public official." 18 U.S.C. § 201(a)(1).

The regulation to which the appellants refer us, which says that a fee appraiser is not an agent of the Government, 38 C.F.R. § 36.4301, has no bearing upon our decision; no one is trying to attribute to the Government an act of Jakey Madeoy as its agent. In any event, the Supreme Court's conclusion that a person does not have to be in a contractual or agency relationship with the Government in order to be a public official, *Dixson,* 465 U.S. at 498, 104 S.Ct. at 1180, makes the regulation irrelevant to our interpretation of the bribery statute.

■ Finally, the decision that we reach today does not implicate the rule of lenity. The appellants have presented no reason, and we see none, why the statute is any more ambiguous with respect to a VA fee appraiser than with respect to the corporate officers in *Dixson,* where the Supreme Court expressly found that because Congress's intent was sufficiently clear, there was "no need to resort to the rule of lenity." *Id.* at 500 n. 19, 104 S.Ct. at 1182 n. 19. Accordingly, we conclude that the statute brings a VA fee appraiser within the definition of "public official" clearly enough that the rule of lenity does not apply.

## IV. The Forfeiture Verdicts

■ The trial court charged the jury:

If, and only if, you should find any one or more of the defendants guilty of RICO, should you [sic] list on the verdict form, in the space provided, the numbers of all the racketeering acts that you have unanimously agreed that particular defendant committed in reaching the verdict. You are not required to consider all of the racketeering acts but you may consider more than two and, if you wish, all of them.

The jury listed on the verdict form racketeering acts relating to only 11 of the 23 properties. The appellants therefore asked the court to instruct the jury that it could order forfeiture of the proceeds relating only to those 11 properties. The court refused, and the jury's special verdict required the appellants to forfeit amounts equal to the proceeds that the appellants acknowledged deriving from all 23 properties.

The appellants claim that their forfeitures should be reduced to reflect only the proceeds from the 11 properties that the jury identified on the verdict form. Contrary to the appellants' assertion, however, the scope of their RICO enterprise is not necessarily limited to the 11 properties that the jury specifically indicated in its substantive RICO verdict. The district court correctly instructed the jury that it could convict the appellants under RICO without considering whether they committed every predicate act. The jury did undoubtedly conclude, however, that the appellants committed racketeering acts relating to all 23 properties; this is the only inference we can draw from its reaching a guilty verdict on at least one substantive count relating to each property and in light of the district court's instruction. We therefore uphold the decision to order forfeiture of the proceeds from all of the properties.

■ We also reject Friedman's separate challenge to the verdict insofar as it requires him to forfeit some of the proceeds from the sale of a property known as the "Monroe Street Joint Venture." The only connection between the Monroe Street property and this case is that Friedman made a down payment on that property with two $5,000 checks drawn on an escrow account in which, from time to time, he deposited illicit proceeds from his racketeering activities; it was not one of the 23 properties acquired as part of the defendants' illegal scheme. The Government nevertheless sought forfeiture of all of the assets derived from proceeds of the sale of the Monroe Street property on the grounds that they constitute an "interest ... acquired or maintained in violation of [RICO]," 18 U.S.C. § 1963(a)(1), and that they are "property constituting, or derived from, any proceeds ... obtained, directly or indirectly, from racketeering activity," *id.* § 1963(a)(3). The jury's verdict required the forfeiture of some, but not all,

of the identified assets meeting one of these statutory criteria.

Friedman attacks the forfeiture verdict on two grounds, both of which go, at bottom, to the sufficiency of the evidence. First, he asserts that the $10,000 that he invested in the Monroe Street property could not have been the proceeds of his racketeering activity because, at the time the checks were drawn, the escrow account had a negative balance. The apparent lack of funds in the account at the moments that the checks were written is not dispositive, however. There was evidence that Friedman deposited illicit proceeds of his racketeering activities into the account six days after the first check was written, and before it cleared the bank. The jury could rationally conclude, therefore, that Friedman used the illicit proceeds that he deposited into the escrow account to cover the two $5,000 checks, and therefore that Friedman used racketeering proceeds to acquire the Monroe Street property.

Friedman's second argument is that the jury had no legal basis for "bifurcating" the assets derived from the Monroe Street property, i.e., for ordering forfeiture of only some of those assets. We note first that, since Friedman used RICO proceeds to pay for only part of the Monroe Street property, it is not irrational for the jury to conclude that only part of the funds derived from the sale of that property trace to the illicit source of the purchase money. In any event, it is well-settled that a court should not upset a jury's verdict merely because it may be inconsistent. *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). We see no reason why that rule should not apply as well in the context of a verdict of forfeiture; nor have other courts, *see, e.g., United States v. Williams*, 809 F.2d 1072, 1097 (5th Cir. 1987).

## V. Conclusion

We have considered the other issues raised by the appellants, and we conclude that none requires discussion. The appel-

lants' convictions and sentences are therefore in all respects

*Affirmed.*