# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 15, 2010

No. 09-30742

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff - Appellee,

v.

KERN CARVER BERNARD WILSON; DURWANDA ELIZABETH MORGAN HEINRICH,

Defendants - Appellants.

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:08-CR-128

Before BARKSDALE, STEWART, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

For these challenged convictions for bribery of public officials during reconstruction in the aftermath of Hurricane Katrina, primarily at issue is whether one of the defendants, Kern Wilson, qualifies as a "public official" within the meaning of the bribery statute. Error is also claimed for the restriction placed on cross-examination of a Government-witness co-conspirator, and three trial evidentiary rulings. **AFFIRMED.**

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-30742

I.

The bribery and conspiracy at issue concerns the bid process for the enlargement and reconstruction of the Lake Cataouatche Levee, a project located south of New Orleans and part of post-Katrina reconstruction projects supervised by the United States Army Corps of Engineers (USACE). In September 2005, soon after Katrina, Wilson, a retired Army officer and civil engineer, moved to New Orleans, seeking work as a recovery consultant on such projects.

In July 2006, after a brief stint with an emergency-relief consortium, Wilson joined Integrated Logistical Support, Inc. Engineering (ILSI), working under contract for USACE. Wilson's work concerned projects related to construction of embankment protection along coastal waterways. It was while working earlier with the above-referenced emergency-relief consortium that Wilson met defendant Elizabeth Heinrich, a supplier of dirt and sand to various construction projects. Wilson and Heinrich became friends and romantically involved.

In addition, soon after joining ILSI, Wilson met Raul Miranda, an engineer who, *inter alia*, assisted USACE in evaluating and reviewing bids for the Lake Cataouatche project. Part of Miranda's work entailed identifying deficiencies with the bid proposals for USACE's contract-selection committee.

Through their work together, Wilson and Miranda became friends; their desks were next to each other; and Miranda rented a duplex directly above Wilson's apartment. Heinrich met Miranda during her visits to Wilson's apartment.

Heinrich was seeking work with USACE and made well-known her interest in obtaining a contract on a USACE project. Her goal was to qualify as a sub-contractor for the Lake Cataouatche project (the project), furnishing sand and gravel to the prime contractor working the levee construction. During one

2

No. 09-30742

of her visits to Wilson's apartment, Heinrich approached Miranda for information: she asked him to identify the prime contractor qualified to win the Lake Cataouatche contract. This would inform her which contractor to approach in her efforts to win a sub-contract.

USACE's bid process for the project operated on a "best-value approach". For it, USACE assigned value to factors besides price (*e.g.*, technical approach, scheduling) and awarded the contract to the proposal deemed best overall value. Unlike the low-bid process, where bids are typically made open to the public, the best-value approach is not so disclosed. Instead, the bids are kept sealed and only after the proposals are evaluated for addressing specific considerations related to the project are contractors given an opportunity to address any deficiencies and revise their proposals.

To prevent contractors from gaining unfair advantage during such bid process, USACE requires all engineers, whether Government employees or Government contract employees like Wilson and Miranda, to sign a Procurement Integrity Act (PIA) statement. The statement informs its signatories that source-selection and bid-proposal information constitute "proprietary government information" and must be kept confidential. Wilson and Miranda signed this PIA statement.

Following a tip from Miranda, Heinrich decided to support a proposal from Manson Gulf, LLC, one of the prime contractors bidding on the project. Miranda agreed to provide Heinrich and Wilson with information necessary for Manson Gulf to correct technical deficiencies in its bid. In addition, Miranda made clear he expected payment for the confidential information he was relaying to Heinrich about that bid. Heinrich, Miranda, and Wilson agreed Miranda and Wilson would each receive $0.25 per cubic yard of fill material sold by Heinrich to Manson Gulf for the project.

3

Following their agreement, and after Manson Gulf submitted its Lake Cataouatche bid to USACE, Heinrich contacted Mayeux, the head of Manson Gulf's levee division. Heinrich told Mayeux his bid had flaws and she could help him correct them. Heinrich then obtained information from Miranda about that bid. On multiple occasions between 25 September and 3 October 2006, Heinrich, Miranda, and Wilson met to discuss the summary of technical deficiencies in Manson Gulf's proposal. On some occasions, Wilson would obtain the technical information from Miranda at work and relay it to Heinrich that evening. Between 28 September and 2 October 2006, Heinrich contacted Mayeux via telephone, fax, and e-mail, with  information identifying technical deficiencies in his proposal and solutions to address them. Mayeux then used Heinrich's suggestions to respond to questions during Manson Gulf's oral presentation to USACE's source-selection committee. According to Miranda's trial testimony, he had fed some of those questions to that committee, knowing they would help Manson Gulf's proposal.

In the light of this provided data, Mayeux suspected Heinrich had obtained her information from an inside source at USACE. Mayeux informed USACE, which then contacted federal law enforcement. At the behest of the Army's Criminal Investigative Division (CID), Mayeux recorded conversations with Heinrich in which she acknowledged having an inside source at USACE. In that regard, she even told Mayeux at one of these meetings, when he advised her to remain while he briefly left the room, "don't bring the FBI [back] with you". CID intervened and brought the conspirators' activities to an end. Miranda cooperated with Government investigators; pleaded guilty to bribery, in violation of 18 U.S.C. § 201(b)(2)(B); and received, *inter alia*, four-months' imprisonment. Pursuant to his plea agreement, Miranda agreed to testify at trial against Wilson and Heinrich.

No. 09-30742

Heinrich was indicted on: one count of conspiracy to commit bribery, in violation of 18 U.S.C. § 371; and two bribery counts (one each for Wilson and Miranda), in violation of 18 U.S.C. § 201(b)(1)(B). Wilson was indicted on: one count of conspiracy to commit bribery, in violation of 18 U.S.C. § 371; and one bribery count, in violation of 18 U.S.C. § 201(b)(2)(B). Following a jury trial in 2009, they were convicted on all counts. Heinrich and Wilson were sentenced, *inter alia*, to 60 and 70 months' imprisonment, respectively.

## II.

Although Wilson and Heinrich present several claims, Heinrich does *not* challenge her bribery conviction concerning Miranda. At issue are: the district court's restriction of Miranda's cross-examination; its ruling Wilson was a "public official" within the meaning of the bribery statute and, therefore, *not* submitting this "public official" question to the jury; and three trial evidentiary rulings.

## A.

Regarding the limitation on Miranda's cross-examination, in claimed violation of the Sixth Amendment's Confrontation Clause, defendants assert the district court improperly blocked them from establishing Miranda's lack of credibility and motive to lie, by curtailing questions about the detail and scope of his plea agreement. Such claimed violations are reviewed *de novo*; if no Sixth Amendment violation exists, the cross-examination limitation is reviewed for abuse of discretion. *United States v. Jimenez*, 464 F.3d 555, 558-59 (5th Cir. 2006).

The Sixth Amendment guarantees a criminal defendant the right to cross-examine witnesses testifying against him. *E.g.*, *Davis v. Alaska*, 415 U.S. 308, 315 (1974). This right, of course, is not unlimited, *see Delaware v. Van Arsdall*, 475 U.S. 673, 679-80 (1986); and it is *not* infringed provided defendant is able to expose facts from which the jury could draw inferences as to the witness'

5

No. 09-30742

reliability, *see United States v. Davis*, 393 F.3d 540, 548 (5th Cir. 2004). To show the alternative abuse of discretion, defendant must establish clear prejudice, so that "a reasonable jury might have had a significantly different impression of the witness'[] credibility if defense counsel had been allowed to pursue the questioning". *Id.* at 548.

At issue is whether the district court improperly curtailed cross-examination on concrete details of Miranda's plea agreement. During his cross-examination, jurors learned: Miranda had reached a plea agreement with the Government; in exchange for pleading guilty to one count, the Government would not charge him with additional counts; and, in exchange for pleading guilty, the Government would limit Miranda's sentence under the Sentencing Guidelines.

When defense counsel asked about the reduced Guideline sentencing-range specified in that plea agreement, however, the district court ruled:

> All I'm going to let you do is ask him what his understanding [is], if he has one, as to what sentence he's going to get because of his Plea Agreement and if he expects or hopes to get a reduced sentence because of his testimony, and that's it, and let's get off of this Plea Agreement.

Defendants contend this was error because jurors were left unaware of the magnitude of the benefit extended Miranda as the result of his plea agreement; they maintain this benefit was so significant that jurors would have discredited Miranda's testimony, or at least this benefit would have generated a different impression of his credibility.

For the reasons that follow, the curtailment of Miranda's cross-examination was neither in violation of the Sixth Amendment nor an abuse of discretion. Up to the point of the district court's limiting Miranda's cross-examination, the jurors were made aware of critical pieces of information:

No. 09-30742

Miranda did not have a plea agreement when he first met with Agents; Miranda and the Government agreed to the charges to which he would plead; Miranda was charged only with bribery; the Government agreed *not* to charge him for other crimes he committed prior to his guilty plea; he was *not* charged with lying to Agents on 5 October 2006 (when first interviewed by them concerning the project), even though every lie brought the possibility of a five-year sentence; and he was an uncharged member of the conspiracy. Subsequently, the court instructed the jury that Miranda's testimony must be "received with caution and weighed with great care".

Defendants are incorrect in insisting jurors were entitled to know the "magnitude of the benefit" made available to Miranda. The Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish". *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (emphasis in original). Jurors were made more than well aware of the potential bias associated with Miranda's testimony.

Moreover, had the district court permitted cross-examination of Miranda's plea-agreement and corresponding Guideline sentencing-range, it would have improperly revealed to jurors the Guideline-range Heinrich and Wilson faced. *See Pope v. United States*, 298 F.2d 507, 508 (5th Cir. 1962) (informing jurors of matters relating to defendant's sentence opens door to compromised verdicts and confuses issues to be decided). Additionally, revealing that range risked unnecessarily confusing the jury, and one of the purposes of limiting cross-examination is to avoid that. *United States v. Hitt*, 473 F.3d 146, 156-57 (5th Cir. 2006) (trial court retains wide discretion to limit cross-examination based upon concerns of prejudice and confusion). Rather than enter into a complex discussion about the mechanics of the advisory Sentencing Guidelines, the

7

district court was correct to avoid confusing jurors, as well as avoid revelation of prejudicial information concerning Wilson's and Heinrich's possible sentences.

Defendants' reliance upon *United States v. Chandler*, 326 F.3d 210, 221-23 (3d Cir. 2003) (holding prohibited cross-examination significantly inhibited defendant's right to cross-examine witness' motivation to lie because jurors left unaware of the magnitude of the sentence reduction), is misplaced; our court's opinion in *Burbank v. Cain*, 535 F.3d 350 (5th Cir. 2008) is *not* in alignment with *Chandler*. Instead, *Burbank* involved a state court that improperly prevented the defense from questioning a principle witness about the *existence* of her plea agreement. *Id.* at 356. Here, defendants were *not* permitted to explore the details of the possible Guideline sentencing-range Miranda faced; but, unlike in *Burbank*, they *were* permitted to question Miranda about the existence of his plea agreement. Defense counsel were also able to question Miranda about his motives for entering the plea agreement, which included the possibility he might receive a decreased sentence by cooperating with the Government.

The testimony elicited was sufficient to make jurors aware of Miranda's possible motives for testifying against Wilson and Heinrich, and defendants have failed to show reasonable jurors would have received a significantly different impression of Miranda's credibility had the exact Guideline sentencing-range been exposed. *See Davis*, 393 F.3d at 548. In sum, the jury was given an opportunity to form a thorough opinion regarding Miranda's motive or credibility. *Jimenez*, 464 F.3d at 562.

B.

Defendants base error on the district court's instructing the jury that Wilson was a "public official" within the meaning of the bribery statute. They assert: Wilson did not fit within the statutory definition because he was *not* an officer or employee of the United States and his involvement in the conspiracy

was unrelated to his work with USACE; and "public official", as an element of 18 U.S.C. § 201, must be determined by a jury.

Along that line, the district court granted the Government's contested motion *in limine*, prohibiting defendants from challenging Wilson's public-official status. Similarly, in their motions for judgment of acquittal, which the district court denied, defendants contended the Government presented no evidence of corruption concerning Wilson's official decision-making duties and functions. Finally, over defendants' objection, the court instructed the jury that Wilson and Miranda were "public officials".

1.

A question of statutory interpretation is, of course, reviewed *de novo. E.g.*, *United States v. Valle*, 538 F.3d 341, 344 (5th Cir. 2008). The offenses for bribery involving public officials is governed by 18 U.S.C. § 201. For that purpose, "public official" is defined in § 201(a)(1) as follows:

> Member of Congress, Delegate, or Resident Commissioner, either before or after such official has qualified, or an officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof, including the District of Columbia, in any official function, under or by authority of any such department, agency, or branch of Government, or a juror;

18 U.S.C. § 201(a)(1). At issue is whether Wilson's position as an employee of ISLI, under contract with USACE, qualified him as a public official for purposes of the bribery statute, 18 U.S.C. § 201(a)(1), (b)(1)(B), (b)(2)(B).

In addition to the charged conspiracy, Heinrich was charged with bribing Miranda (Count 2) and Wilson (Count 3), in violation of 18 U.S.C. § 201(b)(1)(B); Wilson, with soliciting and accepting a bribe, in violation of 18 U.S.C. § 201(b)(2)(B). Section 201(b)(1), involving Heinrich, states:

No. 09-30742

> Whoever--
> (1) directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, with intent–
> (A) to influence any official act; or
> (B) to influence such public official or person who has been selected to be a public official to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or
> (C) to induce such public official or such person who has been selected to be a public official to do or omit to do any act in violation of the lawful duty of such official or person;

commits a federal offense.  18 U.S.C. § 201(b).  Similarly, § 201(b)(2), involving Wilson, provides:

> Whoever--
> being a public official or person selected to be a public official, directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for:
> (A) being influenced in the performance of any official act;
> (B) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or
> (C) being induced to do or omit to do any act in violation of the official duty of such official or person;

commits a federal offense.  18 U.S.C. § 201(b)(2).

As shown above, an individual hired as a contract employee by a federal agency can qualify as a "public official" under 18 U.S.C. § 201(a)(1).  *See United*

*States v. Thomas*, 240 F.3d 445, 448 (5th Cir. 2001) (prison guard qualified as a "public official", even though he was employed by a private company contracted by INS). Relying upon Supreme Court precedent from *United States v. Dixson*, 465 U.S. 482, 496-97 (1984), as well as case law outside our circuit, our court observed in *Thomas*: "Because the officers were charged with abiding by federal guidelines . . . , they 'assumed the quintessentially official role of administering a social service program established by . . . Congress.'" *Thomas*, 240 F.3d at 447 (quoting *Dixson*, 465 U.S. at 497). The prison guard in *Thomas* was held to be a "public official" because he "occupied a position of public trust with official federal responsibilities, because he acted on behalf of the United States under the authority of a federal agency which had contracted with his employer". *Id.* at 448 (citing *United States v. Neville*, 82 F.3d 1101, 1106 (D.C. Cir. 1996)); *see also United States v. Kenney*, 185 F.3d 1217, 1221-23 (11th Cir. 1999) (employee of engineering firm contracted to the Air Force, tasked with procuring and approving materials and equipment, qualified as a "public official" for purposes of 18 U.S.C. § 201(a)(1)).

Defendants take a more narrow position; they contend Wilson cannot qualify as a "public official" because the nature of the bribery occurred outside of the scope of his contractual duties with USACE. That is, he had no official duties related to the project; and, because the bribery scheme involved a project outside of his official duties with USACE, he cannot qualify as a public official under the bribery statute.

We disagree. For the reasons that follow, the project's being outside Wilson's scope of official duties is of no consequence to his being a "public official" for purposes of 18 U.S.C. § 201.

First, the definitional section of § 201(a), *i.e.*, the definition of "public official" for purposes of the Act, imposes *no* requirement that a bribed "employee" be acting within his official functions to effect a bribe. *United States v. Gjieli*,

11

No. 09-30742

717 F.2d 968, 972 (6th Cir. 1983). "The focus of this section is . . . not upon . . . the bribed individual's ability to effect a result." *Id.* at 976. The bribery statute applies, "regardless of whether . . . the acts to be accomplished are within the scope of the actual lawful duties of the bribed public official and regardless of whether the briber has correctly perceived the precise scope of the official's lawful duties". *Id.*; *see also United States v. Evans*, 572 F.2d 455, 481 (5th Cir. 1978) (bribed public official "incorrect in asserting that the government was required to prove that the unlawful compensation was earmarked for a particular matter then pending before [defendant] and over which he had authority", in context of §201(g)).

Second, Congress intended the bribery statute to be applied broadly. *See United States v. Westmoreland*, 841 F.2d 572, 577 (5th Cir. 1988) ("[I]t is clear that Congress has cast a broad net . . . ."); *United States v. Romano*, 879 F.2d 1056, 1060 (2d Cir. 1989) ("The [Supreme] Court stressed that the bribery statute was drafted with broad jurisdictional language . . . to reach *all* people performing activities for the federal government, regardless of the form of federal authority." (emphasis added)). Instead of a "cramped reading", § 201(a) is "accurately characterized as a comprehensive statute applicable to all persons performing activities for or on behalf of the United States". *Dixson*, 465 U.S. at 496.

Wilson's job carried with it "a significant measure of public trust, which [is] . . . the touchstone for determining whether an individual is a public official". *Neville*, 82 F.3d at 1106 (citing *Dixson*, 465 U.S. at 496). As a construction manager for waterway improvements, he was an integral part of USACE's post-Katrina rebuilding efforts. And, needless to say, this position of public trust gave Wilson proximity to the illegal activity. He was a critical vessel through which Miranda and Heinrich moved confidential information from USACE to Manson Gulf, and his employment placed him at a critical juncture to effectuate

the bribery scheme: his desk was directly adjacent to Miranda, they spoke of their scheme at their office; Wilson used his USACE computer to download and transfer files; and he passed confidential information and computer data to and from Miranda while he was engaged at work. Simply stated, his position enabled him to become a key part of this criminal activity.

2.

In this regard, defendants contend the district court erred by instructing the jury that Miranda and Wilson were "public officials". They claim the issue was instead a factual matter for the jury. *See United States v. Gaudin*, 515 U.S. 506, 522-23 (1995) ("[A] criminal defendant [has] the right to have a jury determine . . . his guilt of every element of the crime . . . .").

It is well established that questions of law are issues typically not dependant "upon the probative value of the evidence" and are therefore decided by the court; questions of fact are submitted to the jury. *United States v. Vidaure*, 861 F.2d 1337, 1340 (5th Cir. 1988). Two circuits have determined that whether a defendant is a public official subject to 18 U.S.C. § 201 is a question of law. *See United States v. Hang*, 75 F.3d 1275, 1279 (8th Cir. 1996) (holding determination of public-official status is question of law); *United States v. Madeoy*, 912 F.2d 1486, 1494 (D.C. Cir. 1990). Similarly, in reserving judgment on whether "public official" is question of law or fact, a third circuit affirmed a jury instruction which provided: "The term 'public official' thus includes an employee of a private corporation who acts for or on behalf of the federal government pursuant to a contract." *Kenney*, 185 F.3d at 1223. There, the jury was also instructed that it needed only to find that defendant "possessed some degree of official responsibility for carrying out a federal program or policy" in order to qualify as a "public official" pursuant to § 201. *Id.*

In any event, for purposes of deciding this issue, we need *not* decide whether a defendant's qualification as a "public official" is *always* a question of

13

No. 09-30742

law. On this record, it was not reversible error for the district court to instruct the jury that Wilson and Miranda were public officials.

Along this line, there was no factual dispute for a jury to decide. Defendants never asserted that Wilson and Miranda were not contractors working for USACE. In fact, Wilson testified at trial that he had been a contract consultant working for USACE. Additionally, Wilson and Miranda did not dispute they were contract consultants for USACE at the time their criminal activity occurred. Any disputes by defendants were purely questions of statutory interpretation—a question of law, *not* fact. Because the term "public official" includes an employee of a private corporation who acts on behalf of the Government pursuant to a federal contract, and because all parties agreed on the contractual nature of Miranda's and Wilson's employment, there was no question of fact for the jury to decide on that point.

Similarly, Wilson's insistence it was for the jury to decide whether Miranda intended to interfere with USACE's bidding process in his capacity as a public official is also a legal, not a factual, issue. As our court stated in *United States v. Baymon*, 312 F.3d 725, 729 (5th Cir. 2002), whether a person qualifies as a public officer hinges upon the person's official responsibilities with the Government, not whether the person intended to act as a "public official" within the nature of the bribery scheme.

## C.

Wilson challenges three trial evidentiary rulings. He contests the district court's: permitting lay opinion testimony from a Government witness on technical computer information; not permitting expert testimony by a defense witness regarding Government computer operations; and prohibiting several character witnesses from testifying at trial on Wilson's lack of motivation by financial reward.

14

No. 09-30742

A decision to admit or exclude evidence is reviewed for abuse of discretion. *United States v. Cantu*, 167 F.3d 198, 203 (5th Cir.1999); *see* FED. R. EVID. 103. "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008) (quoting *United States v. Ragsdale*, 426 F.3d 765, 774 (5th Cir. 2005)); *see* FED. R. EVID. 103(a) (error cannot be based upon exclusion of evidence unless party's substantial rights are affected).

1.

CID Agent Clayton, assigned to investigate the bribery scheme, testified about information he obtained from USACE e-mail accounts of the persons working on the project's source-selection committee. He also testified about his review of Wilson's USACE e-mail account. The import of Agent Clayton's testimony was Wilson's attempt to conceal the content of his sent e-mails containing confidential information about the project. Agent Clayton testified to his review of the e-mail inboxes of Wilson and everyone in USACE's source-selection committee; he determined, based upon Wilson's empty sent-box, that Wilson "deleted the sent folder of all the e-mails prior to [4 October 2006]". Wilson challenges this testimony, claiming it had to be introduced as expert opinion.

"The case law is not completely clear on where to draw the line between expert and lay testimony." *United States v. Caldwell*, 586 F.3d 338, 348 (5th Cir. 2009). While it is true testimony requiring specialized training and experience should be admitted as expert testimony, *see Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 460-61 (5th Cir. 1996), "[t]he trend in the circuits seems to turn on whether the testimony falls within the realm of knowledge of the average lay person", *Caldwell*, 586 F.3d at 348. In other words, for this issue, testimony about a computer may suggest technical expertise, but that does not necessarily mean

15

No. 09-30742

such testimony requires satisfying the standard for expert testimony. *See also Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005) ("A mathematical calculation well within the ability of anyone with a grade-school education is . . . more aptly characterized as a lay opinion . . . .").

Agent Clayton's testimony is closer to lay, than expert, opinion. He testified he was not a forensic examiner, he did not use forensic software in reviewing the e-mails, and his computer background was limited to "a normal computer user of Microsoft Office products". It was obvious from both his background and the nature of his testimony that his examination of Wilson's e-mail account did not require "scientific, technical or other specialized knowledge", FED. R. EVID. 702; instead, his testimony fell "within the realm of knowledge of the average lay person", *Caldwell*, 586 F.3d at 348.

In short, Agent Clayton's testimony was based on reasoning familiar in everyday life. *Yanez Sosa*, 513 F.3d at 200. Thus, the district court did not abuse its discretion in admitting it.

2.

In a related issue, Wilson contends the district court erred in refusing to qualify as an expert witness a defense witness in the field of general technology information systems. Wilson proffered the witness in rebuttal to Agent Clayton's testimony and to testify that Wilson's e-mail could not be deleted from the server, even if deleted at the user's computer. The proffered expert, Stroud, was an expert in Microsoft Outlook, but was unfamiliar with USACE's system or retention policies and had no personal experience with a federal agency. Moreover, Stroud informed the court it was impossible for him to testify on whether Wilson intentionally deleted e-mails from his desktop or laptop computers.

a.

For obvious reasons, "district courts are given 'wide latitude in determining the admissibility of expert testimony, and the discretion of the trial judge . . . will not be disturbed on appeal unless manifestly erroneous'". *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quoting *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir.1997)). Before a district court allows a witness to testify as an expert, it must be assured the proffered witness is qualified by virtue of his "'knowledge, skill, experience, training or education'". *Cooks*, 589 F.3d at 179 (quoting FED. R. EVID. 702). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Cooks*, 589 F.3d at 179 (citing *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)).

There was no manifest error in not allowing Stroud to testify as an expert witness. He lacked experience with federal agencies, was unfamiliar with USACE's system and policies, and stated he could not testify as to whether Wilson intentionally deleted his e-mail files. Moreover, even if Stroud had testified about USACE's Outlook server, the relevant issue was not whether the e-mails were backed-up on a USACE server; rather, it was whether Wilson had previously deleted the e-mails from the sent-box on his computer, a fact Wilson had admitted.

b.

And, as discussed *supra*, even assuming the district court erred by denying such expert-witness testimony, we must decide whether the error was harmless: "affirming the judgment unless the ruling affected a substantial right of the complaining party". *United States v. Norris*, 217 F.3d 262, 268 (5th Cir. 2000); *see* FED. R. EVID. 103(a). Whether an error affects a substantial right of the defendant depends upon "'whether the trier of fact would have found the defendant guilty beyond a reasonable doubt with the additional evidence

inserted"'. *United States v. Tucker*, 345 F.3d 320, 327 (5th Cir. 2003) (quoting *United States v. Roberts*, 887 F.2d 534, 536 (5th Cir. 1989)).

Because of the substantial evidence presented by the Government unrelated to Wilson's e-mails, any error pertaining to the admissibility of Stroud's expert testimony was harmless. There was already sufficient evidence to support Wilson's collusion with Heinrich and Miranda. *Cooks*, 589 F.3d at 180.

3.

Wilson's final contention is that the district court erred by excluding pertinent character witnesses. Only upon rare instances, and with a "clear showing of prejudicial abuse of discretion", will we reverse a district court's limiting character witnesses. *United States v. Gray*, 105 F.3d 956, 963 (5th Cir. 1997) (quoting *Michelson v. United States*, 335 U.S. 469, 480 (1948)).

Of the six character witnesses permitted to testify to Wilson's reputation for honesty and integrity, only two were permitted to testify to their belief that Wilson was not substantially motivated by financial profit, even though the other four witnesses had known Wilson for significant periods of time. In other words, Wilson maintains the district court committed reversible error because, of the six character witnesses permitted to testify, the only two allowed to testify as to Wilson's lack of motive for financial profit had known him the shortest period of time.

The district court did not abuse its discretion; Wilson has not made the requisite showing of prejudice. The district court placed no limitation on the jury's consideration of any of the character witnesses; the instructions charged jurors to "consider such evidence along with all the other evidence in the case". Moreover, the instructions informed jurors that character evidence "may give rise to a reasonable doubt, since you may think it improbable that a person of good character in respect to those traits would commit such a crime".

No. 09-30742

Additionally, the Government asked relatively few questions of the character witnesses.

Wilson's reliance upon *United States v. John*, 309 F.3d 298 (5th Cir. 2002), is misplaced. In *John*, the district court committed reversible error because it failed to instruct the jury that it could consider evidence of defendant's good character; *John* does *not* hold (as Wilson suggests) that a district court commits reversible error by limiting the number of character witnesses. In *John*, the district court permitted defendant to introduce several witnesses to testify to defendant's good character, but denied defendant's request for a jury instruction regarding character. *John*, 309 F.3d at 300. Here, the district court not only permitted the introduction of evidence that would establish Wilson's character as a law-abiding citizen, but also properly instructed the jury that it could consider evidence of Wilson's good character.

Given the district court's broad discretion, *see United States v. Parziale*, 947 F.2d 123, 129 (5th Cir. 1991), together with the fact that the two character witnesses who did testify as Wilson intended had worked with him in the months preceding his employment with USACE, and that three of the other four witnesses broke their association with Wilson before he moved to New Orleans, Wilson was not prejudiced by the district court's ruling. Moreover, Wilson argued in his closing that he lacked motive for financial profit. There is simply no reason to believe Wilson's verdict would have been different had four more of his character witnesses testified to his motivation in participating in the Katrina clean-up.

### III.

For the foregoing reasons, the judgments are **AFFIRMED.**